**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| JEROME BLIGE, | ) | |
| MARSHELL BERNICE LEE, | ) | |
| and the | ) | |
| ESTATE OF SAUDI ARAI LEE | ) | |
| | ) | |
| VERSUS | ) | CIVIL ACTION NO.: CV424-131 |
| | ) | |
| ERNEST FERGUSON | ) | JURY TRIAL DEMANDED |
| IN HIS INDIVIDUAL CAPACITY; | ) | |
| JOHN DOE OFFICER IN HIS | ) | |
| INDIVIDUAL CAPACITY; | ) | |
| CITY OF SAVANNAH | ) | |

---

**COMPLAINT WITH JURY DEMAND**

---

**NOW INTO COURT**, through undersigned counsel, come Petitioners, Jerome Blige, Marshell Bernice Lee, persons of the full age of majority and domiciled in the city of Savannah, Chatham County, State of Georgia, and the Estate of Saudi Arai Lee, for the senseless and unjustified shooting death of Saudi Arai Lee, who was shot and killed by former Savannah Police Department officer Ernest Ferguson.

**JURISDICTION**

1.

This claim arises under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States and for violations of Georgia law.

2.

The Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

**VENUE**

3.

The events giving rise to Plaintiffs' claims occurred in the City of Savannah, which is located within the Southern District of Georgia. Defendant City of Savannah is in Chatham County, Georgia. Venue is proper in the Southern District of Georgia.

## PARTIES

4.

Jerome Blige and Marshell Bernice Lee are the parents of Saudi Arai Lee ("Mr. Lee" or "Saudi Lee").  Mr. Lee was not married and did not have children at the time of his death, so his parents are the proper parties to bring this action under Georgia law.  The Estate of Saudi Arai Lee is entitled to bring this action to recover damages for the conscious pain and suffering and emotional distress suffered by Saudi Lee prior to his death, for funeral expenses, and for punitive damages pursuant to O.C.G.A. § 51-1-9.  The Estate of Saudi Arai Lee has not yet been filed but is imminently forthcoming.

5.

Defendant City of Savannah ("the City" or "the City of Savannah") is a body corporate, organized and established as a municipality by operation of the laws of the state of Georgia and is subject to suit.

6.

Ernest Ferguson ("Ferguson") is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a police officer with Savannah Police Department ("SPD" or "Savannah Police Department") and was acting under color of law.  He is sued in his individual capacity.

7.

John Doe Officer ("Doe") is an individual who, at all times pertinent to the events giving rise to this lawsuit, was a police officer with SPD and was acting under color of law.  He is sued in his individual capacity.

8.

THIS COMPLAINT PUTS ON NOTICE ANY EXCESS POLICY COVERING ANY OF THE NAMED DEFENDANTS.

### FACTUAL ALLEGATIONS SURROUNDING THE
### SHOOTING DEATH OF SAUDI LEE ON JUNE 24, 2022

9.

"Mama, I love you."  Those were the last words ever spoken by Saudi Lee to his mother, Marshell Bernice Lee.  Marshell would never get to hear her son's voice again.

**Before the Shooting**

10.

On June 24, 2022, around 11:45am, 31-year-old Saudi Lee was walking down Gwinnett Street near Magazine Street in Carver Village, a historically Black neighborhood of Savannah, Georgia.

11.

Mr. Lee lived in the neighborhood with his family and was known to often walk around alone. He also frequently visited with neighbors in the area, sometimes sitting with them on their porches or gathering in their yards. He often visited the nearby Giant Discount Food Mart, which acts as somewhat of a community hub for the Carver Village neighborhood.

12.

On the morning of June 24, Mr. Lee walked alone to the food mart, but it was closed. Some neighbors stood nearby in front of the home of Ms. Washington, a community matriarch. Mr. Lee walked over and spoke with the neighbors for a few minutes.

13.

As Mr. Lee stood speaking to them, Ferguson pulled up in his police vehicle to the stop sign near where the men stood, then turned the corner.

14.

Mr. Lee departed from near Ms. Washington's house and began walking back in the direction of the food mart.

**The Unnecessary Escalation by
Ferguson and Lawful Compliance by Mr. Lee**

15.

Around 11:50 a.m., after having circled the block and now coming upon Mr. Lee again, Ferguson suddenly and inexplicably stopped the police vehicle in the middle of the street, jumped out, and barricaded himself behind his vehicle with his weapon drawn, shouting for Mr. Lee to stop. Mr. Lee stopped.

16.

Mr. Lee was legally carrying a concealed firearm with a permit. Mr. Lee informed Ferguson that he had a legally permitted weapon and would reach for his wallet to show him the permit.

17.

Mr. Lee reached for his wallet to show Ferguson the permit, and did show Ferguson the permit and the holster where his weapon was held.  Mr. Lee's hands were raised.

18.

At the same time, Doe pulled up. Upon information and belief, Doe was feet away from Ferguson as he pointed his weapon at Mr. Lee.  Doe could see Mr. Lee holding his wallet in his right hand.

19.

Doe did not intervene and did nothing to de-escalate the situation.

**The Fatal Shooting**

20.

As Mr. Lee held his wallet in his right hand, Ferguson fired multiple shots at Mr. Lee. Witnesses say the bullets struck Mr. Lee in the neck and torso.

21.

A witness who was nearby said that the shots hit Mr. Lee with such force that his body "folded up like a suitcase" before violently crashing down onto the road.

22.

Many individuals in the area and around the store heard the shots and ran to Mr. Lee, whose limp body lay in the street.

23.

Mr. Lee laid on his back, his long hair strewn about and disheveled from the force, rivers of bright red blood pouring from his back and neck.[1]  His bright blue shirt was soaked and spattered in blood.

24.

The contents of Mr. Lee's wallet had fallen out of his hand as he was propelled by the bullets.  Everything that had been in his wallet lay scattered around Mr. Lee, inches from where his right hand landed on the ground.

25.

According to a video posted to social media, the witnesses cried out, asking the police

---

[1] This sequence of events is shown in a bystander video uploaded to social media after the shooting.

officers why they shot Mr. Lee, begging them to help Mr. Lee.  "Y'all shot him! Now help him! Help him."

26.

Nevertheless, approximately four minutes passed before either Ferguson or Doe attempted CPR or rendered any type of medical aid.

27.

Commenters in the video could be heard saying that Mr. Lee did not point his gun at either of the officers.

28.

Mr. Lee was transported by ambulance to Memorial University Medical Center where he was pronounced dead.

29.

The Georgia Bureau of Investigation reported that body worn camera was activated in this case, but as of this filing, it has not been released to the family or to the public.[2]

**Mr. Lee was Lawfully Carrying His Weapon**

30.

Georgia is an "open carry" state.  In 2022, Georgia enacted "permitless carry" legislation that repealed longstanding protections that previously required people to obtain a license (called a "weapons carry license"), pursuant to a fingerprint background check, in order to be eligible to carry concealed loaded firearms in public spaces in Georgia.[3]  Effective April 12, 2022, Georgia now generally permits any "lawful weapons carrier" to carry handguns openly or concealed in most public spaces without any background check or permit required.[4]

31.

Mr. Lee was not only lawfully open carrying, but he went the extra step and carried his permit with him and practiced responsible gun ownership.  There is no legal explanation for the initial police stop or the fatal shooting.

---

[2] Greg Coy, GBI finishes investigation of Saudi Lee fatal shooting by Savannah Police (Aug. 19, 2022), https://www.wjcl.com/article/lee-shooting-gbi-report-now-in-hands-of-da/40936199.

[3] 2021 GA SB 319; Ga. Code Ann. §§ 16-11-127(c); 16-11-125.1.

[4] Ga. Code Ann. § 16-11-127(c); 16-11-126(g); 16-11-125.1(5) (defining "weapon" to mean a handgun or knife).

32.

Mr. Lee, who turned 31 a week before his death, was a very spiritual person who meditated daily and studied Buddhism.  He was also passionate about his music, which is how he earned the nickname "Spitta."  Mr. Lee was a beloved community and family member.

33.

"Not a moment where I don't wake up that I don't think about him and miss him.  Walk to the door and look for him.  No Saudi, he's not coming back," said Jerome Blige.[5]

**ERNEST FERGUSON'S PROBLEMATIC HISTORY IN LAW ENFORCEMENT**

**Ferguson Never Stayed Anywhere Long**

34.

In March 2016, Ferguson began working for the Alabama Department of Corrections (ADOC) in Springville, AL.

35.

He stayed there until March 2018 when he left to work at the University of Alabama at Birmingham ("UAB") Police Department.

36.

He stayed at UAB for just nine months and left in December 2018.  Ferguson then went back to the ADOC in Springville for just three months between February 2019 and May 2019.

37.

Ferguson then moved jobs and states yet again. This time he moved to Fayetteville, North Carolina and worked in a restaurant for three months and a retail store for three months, both between July 2019 and December 2019.

**Coastal State Prison**

38.

Just months after moving to North Carolina, Ferguson moved to Savannah and was employed as a corrections officer at Coastal State Prison ("Coastal") from February 2020 until he started at SPD in March 2021.

---

[5] Destiny Wiggins, Family of Saudi Lee wants body cam footage released after shooting death (Aug. 22, 2022), https://fox28savannah.com/news/local/family-of-saudi-lee-wants-body-cam-footage-released-after-shooting-death.

39.

While employed at Coastal for just over one year, Ferguson was involved in at least nine use of force incidents against people incarcerated there.

40.

His first use of force was the very first month of his employment in February 2020.

41.

On June 6, 2020, during part of on-the-job training for Ferguson, his trainer wrote in a report that Ferguson was "a little too forceful," and "needs to not treat this institution as if it's a level five [prison]."

42.

On August 28, 2020, Ferguson was issued a letter of concern from the deputy warden of security for failing to deploy his body worn camera during a use of force.  He was additionally counseled for leaving his assigned station without approval and was told to wait for assistance before taking matters into his own hands.

43.

On September 25, 2020, Ferguson was issued a letter of reprimand from the warden for not reporting to work and not informing his supervisors that he would not be coming to work.

44.

In November 2020, Ferguson slammed an incarcerated person's arm in the flap of his cell door because he was mad that the person did not close it when told.  The incarcerated person's injuries required medical care.

45.

On December 10, 2020, Ferguson was issued another letter of concern from the warden because Ferguson "took matters into his own hands with no dire cause or approval from a supervisor."  The letter stated: "At this time, your supervisor has voice[d] concerns of you being in multiple Use of Forces with offenders and not giving ample time for help to arrive or for situations to be apprehended by the supervisor."

46.

Days later, Ferguson applied for employment with SPD.

47.

While still employed at Coastal in February 2021, contrary to policy and without waiting for a supervisor as instructed multiple times, Ferguson used extreme force to remove an incarcerated person from his cell.  Ferguson used such violence that blood poured down the incarcerated person's face from his forehead.  The victim required medical attention.  That incident was forwarded for an internal investigation, the results of which are unknown to Plaintiffs.

48.

Public records also show that while working at Coastal, Ferguson failed to follow a supervisor's commands to stop using force, shoved an incarcerated person up against a wall, and used an arm-bar maneuver to take down another.

49.

Due to the multiple use of force incidents Ferguson perpetrated, the warden threatened to reduce his salary.

50.

Ferguson resigned from Coastal on March 3, 2021, after five write-ups by his supervisors, including the warden of the prison.

**Savannah Police Department—Before Killing Mr. Lee**

51.

Ferguson started as trainee in SPD on March 15, 2021.  He was inducted into the force in July 2021.

52.

At the time, the "background check" process by the City included an investigator reviewing a form filled out by anyone at the previous place of employment—not human resources personnel. Additionally, that investigator did not screen an applicant's previous employment file for disciplinary complaints, but rather just took the individual's word for it.

53.

On an unknown date during his employment as a Savannah officer, Ferguson pulled into the parking lot of a hair salon in Carver Village when the owner was opening her store. Without explanation or cause, Ferguson started heavily questioning her. The store owner called the police department and complained.

54.

On October 27, 2021, while off-duty, Ferguson was practicing drawing his ECD (electronic control device, otherwise known as a taser) at his residence, and while doing so, discharged his ECD. He was issued written counseling for this violation of policy.

55.

On November 3, 2021, Ferguson failed to activate his body worn camera, counter to department policy, during a show of force in Carver Village—the same neighborhood where he killed Mr. Lee. In this incident, Ferguson initiated the traffic stop of a 68-year-old Savannah man, with his gun-drawn, and without reason, handcuffed the man before putting him in the back of the police car. He was issued written counseling as a consequence for this violation of department policy.

56.

On January 27, 2022, Ferguson failed to activate his body worn camera, counter to department policy, when he attempted a traffic stop for an equipment violation at Magazine Ave. and Gwinnett St. in Carver Village. The vehicle ultimately did not stop, and once Ferguson disengaged his emergency equipment, the subject collided with a parked car. Ferguson was issued a written reprimand for this violation.

57.

In March 2022, Ferguson and another officer inexplicably pulled a man out of the Giant Discount Food Mart in Carver Village and detained him. When asked why he was being detained, Ferguson claimed that they got a call stating a teenager in the area had a gun. The man they were illegally detaining was not a teenager, and in no way physically resembled a teenager.

58.

Also in March 2022, Ferguson and another officer again stopped and forcefully detained a Giant Discount Food Mart customer outside of the store with no explanation. After several minutes, many other customers and community members became concerned and asked Ferguson why he was restraining the individual. In response, Ferguson pointed his department issued chemical spray in a community member's face. Eventually a lieutenant arrived and instructed Ferguson to leave.

59.

The concerned citizen who Ferguson pointed mace at called Chester Ellis, the chairman of the Chatham County Board of Commissioners, to inform him that Ferguson was harassing members of the community.  The incidents outside the food mart were just a few of many community complaints about Ferguson, who was known to stop and harass individuals in Carver Village and around the food mart.

60.

Sometime after the March 2022 incidents, SPD held a community meeting at the Carver Community Center to discuss what occurred.  Ferguson was present.  Shortly after the meeting, Ferguson was removed from patrolling the Carver Village neighborhood.  Tragically, he was returned to that patrol shortly before he killed Mr. Lee.

61.

According to SPD public records, on April 22, 2022, Ferguson received a use of force complaint.

62.

On May 5, 2022, Ferguson again failed to activate his body worn camera, counter to department policy, when he attempted a traffic stop of a bicycle in the area of MLK Blvd. near W. Bryan St.  Ferguson followed behind the subject and struck the subject's bicycle.  Ferguson received a letter of reprimand.

63.

On May 28, 2022, Ferguson received a use of force complaint.

64.

On June 6, 2022, Ferguson received a use of force complaint.  On that same day, 911 dispatch records show Ferguson was called to the food mart near where Mr. Lee was killed because people were allegedly loitering outside the store.  No police report was filed.

65.

Approximately one to two weeks before the shooting, Mr. Lee was in the backyard of his family home in Carver Village meditating, as he often did. Out of nowhere, Ferguson pulled up, and without explanation or reason, began questioning Mr. Lee—even though Mr. Lee was simply peacefully practicing his religion in the backyard of his own home.

66.

Ferguson killed Mr. Lee days later.  He was placed on administrative leave from the department.

**Savannah Police Department—After Killing Mr. Lee**

67.

While on administrative leave, Ferguson was arrested for drunk driving in Liberty County on September 11, 2022.  When asked if he had been drinking, Ferguson lied to the officer who stopped him and said he had not been drinking and had been visiting his mother.  The deputy smelled alcohol coming from inside the vehicle, which was not insured. Ferguson later admitted to a SPD investigator that he had been drinking downtown with other SPD officers, including a shot of Jägermeister and 8 or 9 beers.  Ferguson underwent a field sobriety test, where dash camera video showed he appeared to have trouble keeping his balance.  Ferguson also submitted to a portable breathalyzer test.  He blew a point .129, far above the legal limit of .08.

68.

Though Ferguson was not fired for repeatedly breaking department policy and later killing Saudi Lee, SPD fired him in October 2022 for the conduct related to the drunk driving arrest.

69.

On January 1, 2023, in Clay County, Florida, police arrested Ferguson for shoplifting expensive watches from a store.

70.

On February 25, 2023, Ferguson was arrested in Columbus, Georgia on drug charges. According to the police report, officers found methamphetamine.  The arresting officer wrote, "… a small bag of clear crystal-like substance was found in his left sock … a blow torch and glass smoking device in his left front pocket."

71.

On April 10, 2023, Ferguson was arrested by SPD on the charge of robbery by sudden snatching.  He allegedly robbed a $24,000 Rolex watch from a store on December 27, 2022.

### THE SAVANNAH POLICE
### DEPARTMENT'S INTERNAL FAILURES MADE PUBLIC

72.

In April 2020, seventy-seven (77) SPD members with twenty-two (22) different allegations filed a complaint with the City,[6] directly pointing a finger at then Chief of Police Roy Minter.[7]

a.   SPD Chief Roy Minter was described as using "intimidation and admonishment to instill embarrassment as a tool and instill his power in numerous meetings where officers, supervisors, and commanders were publicly belittled in front of his peers and subordinates."[8]

b.   He was also accused of "a refusal to put his name to decisions that affect the department as a whole to avoid liability or blame."[9]

c.   The document alleged that the chief "does not assume control over what he sees as an issue and attacks decisions at a later time."  He exhibits a "failure to act in chaotic situations."[10]

d.   Minter was described as someone who makes "untrue statements to the public, the media, employees, and politicians concerning the effectiveness, strategies, morale, manpower, and readiness of the department."[11]

e.   The complainants said the chief didn't plan for the safety of his officers with proper supplies and equipment.  He pushed "unfocused training practices that do not train and develop for the future of the department."  Minter's actions led to a "complete breakdown of communication between levels of command staff to mid-level supervision and employees."[12]

---

[6] Andrew Davis, 77 members of the Savannah Police Department, 22 different complaints, all given to the city last week, directly pointing a finger at Chief Roy Minter, (Apr. 21, 2020), https://www.wsav.com/crime-safety/only-on-377-spd-officers-file-22-count-complaint-against-chief-minter/.

[7] Minter was the chief at the time of Mr. Lee's death.  Current chief Lenny Gunther is the City's official policymaker for SPD.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

    f.   Among the 77 names on that document were sergeants and lieutenants, as well as all five of SPD precinct captains.[13]

73.

A survey of SPD officers in April 2022—two months before the killing of Saudi Lee—demonstrated a department in crisis. The Savannahian obtained a copy of the results of the Continuous Improvement Survey as completed by SPD.[14] An email exchange in connection with the survey seems to indicate that the survey is a City program, and SPD was one of the first agencies given the opportunity to participate. 255 people completed the survey.[15]

    a.   The most resounding call was for more staff, immediately. One respondent claimed that over 50 officers resigned the previous year, and another estimated the department as being 100 officers short.[16]

    b.   Officers reported working 12-hour shifts to make up for the lack of staff, leading to burnout.[17] Adding to the strain were the special events that the officers were asked to work, along with a general increase in service size because of the newcomers to Savannah.[18]

    c.   Officers also complained about the lack of appropriate medical equipment: "Medical equipment offices are given a first aid kit to treat any injuries sustained [while] working. However this first aid kit does not have the adequate supplies need [sic] to treat more serious injuries that an officer will face when working," wrote one officer.[19] "There is no tourniquet, or clotting agents to stop massive bleeding from injuries consistent with gunshot wounds or a car accident. The first aid kit given can only treat minor scrapes and bruises."[20]

---

[13] *Id.*

[14] Rachael Flora, 'Trust in leadership is not there': Inside the Savannah Police Department, a lack of staff, respect from command (Apr. 7, 2022), https://www.thesavannahian.com/breaking-news-trust-in-leadership-is-not-there-inside-the-savannah-police-department-a-lack-of-staff-respect-from-command/.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

    d.   Training was also named as an issue, with several respondents mentioning that there were no physical fitness standards and that officers were not held accountable when found unfit for duty.  "We do not take defensive tactics training serious, first aid training or firearms training," wrote one respondent.[21]

## SAVANNAH POLICE DEPARTMENT'S PATTERN
## AND PRACTICE OF UNCONSTITUTIONAL POLICING

74.

The deprivation of Mr. Lee's rights under the Fourth and Fourteenth Amendments of the United States Constitution resulted from and were caused by an unconstitutional policy, custom, and/or practice of the Savannah Police Department, through the City of Savannah, that allows and encourages Savannah Police Department officers use excessive force on civilians.

75.

The deprivation of Mr. Lee's rights under Fourth and Fourteenth Amendments resulted from and were caused by (1) a policy, custom and/or practice of the Savannah Police Department, through the City of Savannah, to employ excessive force; (2) by the Savannah Police Department, through the City of Savannah, failure to adequately train his its officers with respect to the manner and circumstances in which deputies are to use excessive force; and (3) by the Savannah Police Department, through the City of Savannah, policy, practice, or custom of tolerating excessive force from officers evidenced by decisions to not discipline, demote, and/or terminate Ferguson as a result of his multiple, unjustified uses of force and eventual fatal shooting of Saudi Lee.

76.

The decision of the Savannah Police Department, through the City of Savannah, to not discipline, demote, and/or terminate Ferguson as a result of the killing of Mr. Lee illustrates and implements an official policy, practice, or custom of tolerating violations of a civilian's constitutional rights and encourages its officers to employ excessive force against community members.

77.

As a result of the policies, practices, and/or customs of the Savannah Police Department, through the City of Savannah, Ferguson's unconstitutional behavior, as alleged above, was and is

---

[21] *Id.*

a custom of the Savannah Police Department that it is perfectly acceptable to use unnecessary and unwarranted violence against community members.

78.

The failures of the defendants are well known and consistent with a pattern and practice of unconstitutional policing against people who are in the custody of, or interact with, Savannah Police Department officers. There have been numerous articles published, investigations conducted, and lawsuits filed against the Savannah Police Department, through the City of Savannah, that demonstrate a practice and pattern of similar constitutional violations that indicate the existence of an informal custom or practice that violates individuals' rights.

79.

Between January 2022 and June 2022, when Ferguson killed Mr. Lee, Chatham County had experienced six officer-involved shootings, five of those within the City of Savannah's jurisdiction — an average of one police shooting a month.  Five of these ended in civilian deaths.

80.

There were five police shootings by Savannah Police during 2021, two in 2020, one in 2019, and 3 in 2018.

81.

In 2016, the United States Department of Justice ("DOJ") released a report entitled "Police Integrity Lost: A Study of Law Enforcement Officers Arrested."  As part of its research, the DOJ studied police departments across America between 2005-2011.  Included in the list of  police departments with the highest rates of officers arrested per 100,000 population was the Savannah Police Department, with a rate of 2.26 officers arrested per 100,000 population.[22]

82.

Recent lawsuits against the Savannah Police Department, through the City of Savannah, and its officers include—but are not limited to—the following:

    a.  On August 21, 2016, a man had a seizure and lost control of his vehicle, leaving him incapacitated as the car accelerated.  The investigating officer reviewed the hospital records, which showed that he was given several doses of Fentanyl and Midazolam in an effort to save his life.  The officer

---

[22] *See* Philip Matthew Stinson, Sr., J.D, Ph.D., John Liederbach, Ph.D., Steven P. Lab, Ph.D., Steven L. Brewer, Jr., Ph.D., Police Integrity Lost: A Study of Law Enforcement Officers Arrested (April 2016), https://www.ojp.gov/pdffiles1/nij/grants/249850.pdf.

prepared a report in which he noted that the toxicology results indicated the driver was under the influence of Fentanyl and Midazolam, falsely noting that he reached this conclusion because he had obtained and reviewed the hospital records and EMS report, which did not list them. In fact, the hospital records listed them several times. The man was arrested and spent six months in jail before being granted bond. At the bond hearing, false evidence from the officer was presented depicting the man to be a "drug addict, thief, and a danger to the community." Though that case was eventually thrown out, the officer then charged the man under a new theory that he was "driving a motor vehicle with a known seizure disorder without having taken his prescribed medication." He was prosecuted again, this time for four years until 2022 when the State of Georgia ultimately moved to dismiss the case due to insufficient evidence.

b. On November 20, 2016, a man was leaving a bar when he was stopped by a SPD. officer. Though the man initially tried to walk away, he fell, so he put his hands up, got on his knees, and then laid flat on his stomach with his arms stretched out to his sides in a clear posture of surrender. Despite being totally laid out flat on the ground and completely compliant, the officer put a knee in the man's back and neck as he handcuffed him. He then threw him face down on the front hood of a vehicle and used restraints which caused pain in the detainee's wrist and shoulders. The officer refused to allow the man to use the restroom and, instead, grabbed him around the neck and choked him. The man was transported to the hospital where it was determined that his shoulders were sprained and he had marks around his neck and wrist. The officer lied to hospital staff and said the man sustained the injuries in a fall.[23]

c. In July 2017, a young Black man was walking when he was suddenly chased by a SPD officer in an unmarked car. When the officer ordered him to stop or be shot, the man immediately stopped, only then learning the person

---

[23] *See Green v. Cunningham*, No. CV418-210, 2018 WL 6310269, at *1 (S.D. Ga. Dec. 3, 2018).

chasing him was an officer.  During the arrest, the officer repeatedly dug his knee into the man's leg and back, even though he was not resisting.  The officer also hit the man in the side and back of the head with his service weapon.  Though other officers were present, none of them intervened. Another detective, having come on the scene at some point, then conducted an "illegal show up."  The detective then falsified statements under oath by at some point claiming he had no knowledge of the man being injured.  The same detective ordered the transport officer to escort him to the hospital. The man suffered abrasions to the right temporal area, facial contusions, lower back sprain.[24]

d.  On August 10, 2018, a man was walking near the intersection of Paulsen Street and East Gwinnett Street in Savannah when SPD officers stopped him.  The officers asked him why he was walking in the street, to which he responded that he was just crossing.  The man was subsequently determined to have a warrant and was brought to the precinct for questioning.  At the precinct, he was restrained to a chair and left to wait for at least two hours before being questioned.  The man declined to answer questions, requested to have an attorney present, and made multiple requests to use the restroom. Following the interview, several officers used force against him, possibly because he took paperwork from a table.  The man suffered injuries and was transported to the hospital.[25]

e.  On or about October 1, 2018, SPD officers responded to a "disorderly person call" at a residence.  Upon seeing a resident through the door, an officer chased him down the hall into the living room where the officer overtook the resident.  After many minutes of struggle, the officer forcibly subdued the resident and handcuffed a child who was present.  The court prosecuting the resident found that the officer acted outside of his lawful capacity by entering the home without a warrant or express permission of

---

[24] *See Harris v. McKie*, No. CV418-040, 2018 WL 3766687, at *1 (S.D. Ga. July 16, 2018).

[25] *See Sanders v. Sanders*, No. CV420-161, 2021 WL 1277964, at *1–2 (S.D. Ga. Feb. 22, 2021).

the homeowner or residents.   The charges against the resident were dismissed.[26]

f.   On December 29, 2018, without probable cause, SPD officers stopped and restrained a man who was walking.  While he was restrained, officers kicked the man and used other force.  Because of his arrest, the man's probation was revoked in 2019.  He later succeeded in suppressing the evidence collected during the stop and the charges arising from it were dropped but he was unsuccessful in securing relief from his probation revocation, causing him to remain incarcerated.[27]

g.   In April 2020, SPD officers conducting a "warrant sweep" violently attacked a man who was not the individual the officers were looking for.  One of the officers body-slammed the man to the ground, punched him in the face, and squeezed his eyes until their blood vessels broke.  Then, even though he told the officers he was not the individual they were looking for, and even though the officers checked his identification confirming he was not the suspect, he was still held and detained.  The man was bloodied on the chin, a wound which eventually needed stitches.  One of the officers then put a knee on the man's head and pulled his t-shirt over his face as the man cried out, "I can't breathe!"  In response, the officer called him a crybaby.[28]

h.   A man was falsely accused of a murder by SPD officers in 2021 and spent two years in prison before the charges were dropped due to the lead detective falsifying and withholding evidence in the case.  The detective withheld exculpatory video, which dramatically mischaracterized the detective's account of events and concealed the fact that there was no evidence linking the man to the murder.  The lawsuit alleged that SPD "had a policy, practice, procedure and/or custom which permitted employees to

---

[26] *See Javin Cooper v. The Mayor and Alderman of the City of Savannah,* No. 4:2020-cv-00238 (S.D. Ga. Sept. 30, 2020).

[27] *See Bizzard v. Foraker*, No. CV423-004, 2023 WL 2480468, at *1 (S.D. Ga. Mar. 13, 2023).

[28] *See Parrish v. Wood*, 4:23-cv-00261-JRH-CLR (S.G.D, Sept. 14, 2023); Molly Curley, Man jailed for nearly 2 years sues former SPD detective, city (Sept. 29, 2023), https://www.wsav.com/crime-safety/man-jailed-for-nearly-2-years-sues-former-spd-detective-city/.

alter material exculpatory evidence and/or suppress it from being turned over to criminal defendants and their counsel."  Rather than conduct any meaningful review and propose any changes in policy, the City's mayor defended the officers' training.

i.  On December 8, 2021, an individual was stopped by an officer for allegedly riding a bicycle without a light.  After a brief interrogation, and the arrival of several other officers, the man agreed to be fingerprinted, but then mounted his bicycle.  As he attempted to leave, the officer taking his fingerprints grabbed his jacket and pulled him off of the bicycle to the ground.  The officer then struck the man, causing his head to hit the ground.  Another officer then began to kick and stomp him, while the first officer held him on the ground.  Another unidentified officer then dragged him by his clothing and, with other officers' assistance, threw him into the backseat of a police vehicle.  He required medical attention at a hospital.[29]

j.  On April 3, 2022, one of the same officers involved in the December 8, 2021, incident approached the same man and at least one other unidentified individual to inquire about "loitering and prowling in the parking lot of [a] Family Dollar."  The officer tased the man and arrested him.[30]

k.  On April 2, 2021, a 60-year-old man in the custody of the SPD died by suicide.  The man was brought to the station and interrogated.  The man described himself as a paranoid schizophrenic with anxiety who was "really depressed" and who took medication for depression.  During the interview, the man was crying.  He stated that he would rather die than go to jail and that the police would have to kill him before he would go back to jail.  He also stated, "I'm not a violent person but I'll stand on myself and kill myself."  Shortly thereafter, officers left him alone in interview room without supervision, where he was later found hanging.[31]

---

[29] See Reynolds v. Minter, No. 4:24-CV-40, 2024 WL 1516115 (S.D. Ga. Apr. 8, 2024).

[30] Id.

[31] See Est. of Harvey v. Minter, No. CV423-064, 2024 WL 457813 (S.D. Ga. Feb. 6, 2024).

i. Four days after his death, a SPD officer circulated a meme of a Black man hanging to a group chat of officers.  He wrote, "Is this too early to send this to Greene?" who is a Black officer.  One officer interviewed by the Internal Affairs unit said he believed the officer "had sent the hanging GIF/meme to the wrong chat group and had instead intended to send it to another chat group composed of white officers only," according to a lawsuit.[32]

ii. A supervisor told Internal Affairs that there was a separate chat group created that included white officers only where they essentially vented or expressed their concerns about Officer Greene' (a black officer).  She and another supervisor participated in police chat groups for their watch that excluded Black officers and included only white officers.[33]

83.

Indeed, the Savannah Police Department, through the City, are known and frequently sued for alleged violations of the Fourth Amendment for unreasonable searches and seizures, and excessive force, including deadly force.

**CAUSES OF ACTION**

**Count I**
*Excessive Force under the*
*Fourth and Fourteenth Amendments and 42 U.S.C. § 1983*
*against Officer Ferguson*

84.

When Ferguson shot and killed Mr. Lee, Mr. Lee did not pose an immediate threat of serious physical harm or death to other persons and, as a result, Ferguson's use of deadly force was unjustified and constituted a violation of the Fourth and Fourteenth Amendments to the United States Constitution.

85.

Based on the totality of facts and circumstances described herein, no reasonable officer could have believed that Mr. Lee posed any immediate threat of serious physical harm or death to any person while he held his arms up and showed the officer his wallet.

---

[32] *Id.*

[33] *Id.*

86.

Every reasonable officer would have known that the force used by Ferguson was unreasonably disproportionate and excessive and would violate Mr. Lee's Fourth and Fourteenth Amendment rights.

87.

Ferguson violated clearly established law and is not entitled to qualified immunity for his use of deadly force in shooting Mr. Lee.

88.

As a result of Ferguson's unlawful conduct, Mr. Lee sustained injuries which caused his death, suffered pain in advance of his death, and Plaintiffs suffered as a result of the loss of their son, Saudi Lee.

**Count II**
*Deliberate indifference to medical needs under 42 U.S.C. § 1983*
*against Ferguson and Doe*

89.

After Mr. Lee was shot, he immediately fell to the ground.

90.

While Mr. Lee was bleeding on the ground, Ferguson and Doe had knowledge that Mr. Lee sustained multiple gunshot wounds, had knowledge that Mr. Lee's gunshot wounds were serious and required immediate medical attention.  Mr. Lee bled profusely from his wounds, causing blood to pour out of his body and into the street.

91.

Rather than render medical aid to Mr. Lee or make any effort to do so, Ferguson and Doe did nothing for several minutes.

92.

Mr. Lee was physically helpless while bleeding from his gunshot wounds on the ground, at which point Mr. Lee was in the full control of Ferguson and Doe, posed absolutely no risk of harm to anyone, and was physically incapable of resisting arrest.

93.

While Mr. Lee was bleeding on the ground, he was not resisting arrest, was not attempting to flee, and was not posing any threat of harm to Ferguson, Doe, or any other person.

94.

Ferguson and Doe's conscious decision to deny medical aid to Mr. Lee's serious gunshot wounds for approximately four minutes constitutes deliberate indifference to Mr. Lee's serious medical needs in violation of the Fourth and Fourteenth Amendments.

95.

Every reasonable officer with knowledge that Mr. Lee had sustained multiple serious and potentially deadly gunshot wounds would have known that failing to render immediate medical aid would violate Mr. Lee's Fourth and Fourteenth Amendment rights to medical treatment.

96.

Ferguson and Doe are not entitled to qualified immunity for their failure to render medical aid to Mr. Lee in violation of the Fourth and Fourteenth Amendment and are liable for the damages resulting from the same.

97.

The policies and procedures of the Savannah Police Department that direct that medical aid be rendered by its officers constitutes a ministerial duty.  Defendants Ferguson and Doe breached that ministerial duty through their negligent or intentional conduct and, as result, are subject to liability to Plaintiffs for the pain and suffering of Mr. Lee during his last remaining moments of life.

**Count III**
*Municipal liability under 42 U.S.C. § 1983*
*Negligent Hiring and Retention*
*against the City*

98.

The test for establishing supervisory liability based on a hiring decision is one of deliberate indifference, or that the hiring official disregarded a known or obvious consequence of his or her hiring decision.

99.

Ferguson's previous employment history, numerous disciplinary infractions, and abusive treatment of Savannah's citizens, including Mr. Lee, are detailed above in paragraphs 34-65. Plaintiffs reassert and reallege all paragraphs herein.

100.

It is apparent that Ferguson never stayed anywhere long, which would lead a reasonably prudent person or entity to question why he was only spending months at a time at a job before moving to the next one— often in an entirely different state—over the course of several years.

101.

Furthermore, the City did not properly obtain or review Ferguson's previous disciplinary history at Coastal, instead just taking his word for it on his application that he did not have any conflicts or discipline issues at his previous job and had never been investigated while working in law enforcement, which was patently false.  They also took the word of a prison peer of Ferguson's that he had no disciplinary record and did not bother to request or go look through his file.

102.

The City was deliberately indifferent in its background check procedures and acted with disregard for the members of the community, like Mr. Lee, who interacted with police.

103.

Because of their failure to properly screen Ferguson's background, he was released onto the streets of Savannah, and specifically Carver Village—a Black neighborhood—where he was known to stop and harass people without cause.  As a result of this indifference, Ferguson continued his bad behavior, eventually killing Mr. Lee.

104.

Adequate scrutiny of Ferguson's background—done with any exercise of due diligence— would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire him would be the deprivation of a third party's federally protected right, which happened here.

105.

The City's failure to properly vet Ferguson's serious history of misconduct and abuse while a law enforcement officer before hiring him significantly contributed to the death of Mr. Lee.

106.

The City admitted its previous indifference when it completely changed its background check procedure after Ferguson killed Mr. Lee.  When screening applicants now, the background investigator must physically go out and go through the file from their previous jobs, specifically

law enforcement.[34]  Had the City done this before Ferguson was hired, Mr. Lee would still be alive today.

**Count IV**
*Municipal liability under 42 U.S.C. § 1983*
*Failure to Train and Supervise*
*against the City of Savannah*

107.

The City's insufficient oversight of use of deadly force incidents, unconstitutional policy, and inadequate training create an overwhelming risk that its officers will use deadly force when doing so is unconstitutional.

108.

The Chief of Police is the final policy maker for all matters related to the training and discipline for officers employed by the of City of Savannah, and is himself an employee of the City, or otherwise directed by the City.

109.

The frequency with which officers violate the Fourth and Fourteenth Amendments and use excessive and deadly force reinforces the need for the City to provide competent and thorough training on the circumstances that authorize search, seizure, and the use of deadly force.

110.

The City's failure to train its officers, and specifically failure to both appropriately discipline and train Officer Ferguson, were the driving force behind Ferguson's belief that deadly force was authorized, and the driving force behind Ferguson's decision to use deadly force against Saudi Lee.

111.

A plaintiff may prove that a failure to supervise is a city policy by demonstrating that the city's failure evidenced a deliberate indifference to the right of its inhabitants. Deliberate indifference requires proof that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.

112.

Ferguson was disciplined several times before killing Mr. Lee, but each time he only received a slap on the wrist.  Despite failing to activate his body worn camera during uses of force,

---

[34] Jake Shore, More review in officer hiring (Feb. 2, 2023), https://thecurrentga.org/today-from-the-current/georgia-gang-bill-violence-intervention/

the City permitted his conduct to continue.  Despite initiating a traffic stop of an older gentlemen with his gun immediately drawn, the City permitted him to continue.   And despite having knowledge that Ferguson was repeatedly profiling and harassing community members in Carver Village, and acknowledging that he was a problem by briefly removing him from patrolling there, the City knowingly permitted him to continue and placed him back on patrol in Carver Village shortly before he killed Mr. Lee.

113.

The City knew of the need to train and supervise Mr. Lee on constitutional policing, but it acted with deliberate indifference when failed to do so and instead released him back in the same area he was known to terrorize Black residents.

114.

Additionally, Mr. Lee was the fifth victim of a police shooting in Savannah in 2022. Several civilians were already dead in mere months because of the use of deadly force by police.

115.

The City was on notice before Mr. Lee's death of its need to train and/or supervise on the use of deadly force, and the City made a deliberate choice not to take any action.  This deliberate indifference contributed to Mr. Lee's death.   Had the City properly trained and supervised Ferguson, Mr. Lee would still be alive today.

**Count V**
*Battery under Ga. Code § 51-1-13 and the Constitution of the State of Georgia
against Officer Ferguson*

116.

A physical injury done to another shall give a right of action to the injured party, whatever may be the intention of the person causing the injury, unless he is justified under some rule of law.

117.

No reasonable officer could have believed that Mr. Lee posed any immediate threat of serious physical harm or death to any person while he held his arms up and showed the officer his wallet.

118.

Based on the totality of facts and circumstances described herein, there is no justifiable reason for Ferguson to have used deadly force against Mr. Lee.   Ferguson's intentions are irrelevant.

119.

By virtue of the facts described herein, the actions of Officer Ferguson constitute battery under Georgia law; a violation of Article I, Paragraph XIII of the Constitution of the State of Georgia; and abuse in being arrested in violation of Article I, Paragraph XVII of the Constitution of the State of Georgia.

120.

Ferguson acted with actual malice and an intent to injure Mr. Lee by using deadly and excessive force such that he is not entitled to official immunity under state law.

121.

As a result of Ferguson's unlawful conduct, Mr. Lee sustained injuries that caused his death, suffered pain in advance of his death, and Plaintiffs suffered as a result of the loss of their son, Saudi Lee.

**Count VI**
*Negligence under Ga. Code § 51-1-2*
*against John Doe Officer*

122.

In general, ordinary diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances.  A plaintiff may bring a negligence claim for an officer's alleged failure to intervene to prevent the use of excessive force.

123.

In order to prevail on a claim for negligence, the injured party must demonstrate: (1) that there was a duty of care owed to the injured party by the alleged negligent party; (2) that the duty was breached, (3) that there's an "actual causal" connection linking the conduct of the defendant and the harm that resulted, or "proximate causation" relating to whether or not the harm could have been foreseen; and (4) that actual harm or damages resulted from the conduct of the defendant.

124.

Doe owed a duty of care to Mr. Lee to act as a reasonably prudent peace officer.  Doe breached that duty when he pulled up and saw Ferguson's gun raised at Mr. Lee, saw Mr. Lee show Ferguson his weapons permit, and failed to de-escalate or intervene.  Doe also failed to provide necessary, possibly life-saving medical care to Mr. Lee. Doe's actions were at least the proximate cause of Mr. Lee's death, and death resulted, causing injury to Mr. Lee and the Plaintiffs.

**Count VII**
*Wrongful Death under Ga. Code § 51-4-1*
*against Officer Ferguson and Doe*

125.

Ferguson and Doe are liable for the death of Mr. Lee. Ferguson and Doe acted with deliberate indifference to Mr. Lee's constitutional rights and humanity, including their callous disregard for Mr. Lee's medical needs.

126.

The actions and inactions of Ferguson and Doe were the proximate cause of the damages suffered by Mr. Lee and the Plaintiffs. The use of excessive and deadly force by Ferguson, and Doe's negligence therein, proximately caused Mr. Lee to be physically injured to the point of death and upon information and belief, experience conscious pain and suffering, and severe emotional distress before he died.

127.

Mr. Lee was not married and had no children. Plaintiffs, the parents of Mr. Lee, are entitled to recover for Mr. Lee's wrongful death, including general damages and other compensable injuries. These damages and compensable injuries include pecuniary losses such as funeral and burial expenses.

128.

Plaintiffs have also suffered damages in the form of loss of love, affection, and support from Mr. Lee, with whom they were exceptionally close. Additionally, the willful, cruel, and unconscionable actions of Ferguson and Doe warrant punitive damages for the incredible suffering caused to Plaintiffs.

**Count VIII**
*Survival Action under Ga. Code § 9-2-41*
*against Ferguson and Doe*

129.

Mr. Lee was not married and had no children. Plaintiffs, the parents of Mr. Lee, have standing to bring this claim, as does the Estate of Saudi Arai Lee.

130.

Ferguson and Doe, who were acting under the color of state law, deprived Mr. Lee of the rights, privileges, and immunities afforded to him under the Constitution and laws of the United States by subjecting him to unreasonable and excessive and deadly force.

131.

As explained above, Ferguson and Doe's conduct ultimately caused Mr. Lee's death. Ferguson and Doe not only lacked any regard for Mr. Lee's humanity, but also acted in callous disregard and with deliberate indifference to the rights afforded to him under the Constitution, including to be free from excessive and deadly force.

132.

Ferguson and Doe's wrongful acts and omissions not only caused Mr. Lee's wrongful death, but were willful, oppressive, malicious, and shocking to ordinary citizens' conscience, all of which warrant an award of punitive damages against Ferguson and Doe.

133.

Plaintiffs have suffered, and continue to suffer, damages as result of the wrongful death of their son, including pain and suffering, grief, loss of enjoyment of life, severe emotional distress, loss of support, and other similar damages.

**JURY TRIAL DEMAND**

134.

Plaintiffs request trial by jury be had upon all issues so triable.

**PRAYER FOR RELIEF**

135.

Plaintiffs respectfully request:

    a.  That Plaintiffs be awarded damages from the Defendants for the pain and suffering of Saudi Lee prior to his death and be awarded all damages, including special, nominal, punitive, and compensatory damages permitted by operation of federal and Georgia law.

    b.  That Plaintiffs be awarded judgment against Ernest Ferguson, John Doe Officer, and the City of Savannah for all damages permitted by law for the wrongful death of Mr. Lee including compensatory damages as measured by the full value of Mr. Lee's life and punitive damages against Ernest Ferguson.

    c.  That the Estate of Saudi Arai Lee recover for Mr. Lee's pain prior to death, his medical expenses incurred as a result of the shooting, and all associated funeral and burial expenses.

d.  That Plaintiffs recover attorney's fees pursuant to 42 U.S.C. § 1988; and

e.  That Plaintiffs be awarded such other and further relief to which they are

legally entitled.

Respectfully submitted this 21st day of June, 2024.

THE CLAIBORNE FIRM, P.C.

WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
DAVID J. UTTER
Georgia Bar Number: 723144
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
will@claibornefirm.com
david@claibornefirm.com

*/s/ Christopher J. Murell*
Christopher J. Murell
Georgia Bar Number: 195116
Meghan Matt*
Louisiana Bar Number: 39975
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law
meghan@murell.law
* Motion for admission *pro hac vice*
forthcoming

**ATTORNEYS FOR PLAINTIFFS**