## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| **JEROME BLIDGE,**[1] ) | |
| **MARSHELL BERNICE LEE,** ) | |
| **and the ESTATE OF SAUDI** ) | |
| **ARAI LEE, by and through** ) | |
| **MARSHELL BERNICE LEE, its** ) | |
| **Administrator,** ) | |
| ) | |
| **VERSUS** ) | **NO.: 4:24-cv-00131-RSB-CLR** |
| ) | |
| **ERNEST FERGUSON,** ) | **JURY TRIAL DEMANDED** |
| **IN HIS INDIVIDUAL CAPACITY;** ) | |
| **MACKENZIE RANDLE, IN HIS** ) | |
| **INDIVIDUAL CAPACITY;** ) | |
| **CITY OF SAVANNAH** ) | |

## OPPOSITION TO THE CITY OF SAVANNAH'S
## MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

**NOW INTO COURT**, through undersigned counsel, and hereby file their Response in

Opposition to Defendant City of Savannah's ("City Defendants" or "City") Motion to Dismiss

Plaintiffs' Second Amended Complaint pursuant to Rule 12(b)(6). *R. Doc. 86.* In support, counsel

states:

### I.    Introduction

This case arises out of the unjustified shooting death of Mr. Saudi Lee ("Mr. Lee") who

was shot in the back[2] by former City police Officer Ernest Ferguson ("Ferguson") while fleeing a

pretextual stop in Mr. Lee's neighborhood of Carver Village, a historically Black neighborhood,

on June 24, 2022.  Plaintiffs allege that the stop, which was aided by former City police Officer

---

[1] On May 2, 2025, Plaintiffs corrected the previous misspelling of Mr. Blidge's last name.  Rather than "Blige," the correct spelling is "Blidge."  R. Doc. 90.

[2] R. Doc. 80 at ¶¶27-29, ¶100 (Ferguson shot Mr. Lee in the back and neck from which rivers of bright red blood poured); *see also,* R. Doc. 73-5 at 3-4, Counts 1 & 5 (indictment alleging that Ferguson committed felony murder and aggravated assault by "SHOOTING SAUDI LEE IN THE BACK") (caps in original).

1

MacKenzie Randle ("Randle"), was part of a pattern and practice by Ferguson of illegally harassing residents of Carver Village generally and Mr. Lee specifically.[3]  In addition, Plaintiffs allege that the pattern and practice executed by Ferguson and Randle was part of a police department-wide practice of systemic constitutional violations by the City[4]— violations that led to the City retaining Ferguson even after he repeatedly committed violations of police department policy prior to murdering Mr. Lee.  R. Doc. 80 at ¶¶59-74.

Having reviewed the evidence presented by the Georgia Bureau of Investigation and a Chatham County District Attorney's Office investigator, grand jurors of Chatham County judicially found that former Savannah Police Officer Ernest Ferguson murdered Saudi Lee in the middle of a Savannah Street.  R. Doc. 73-5 (indictment of Ferguson).  The indictment charges Ferguson with three counts of felony murder, aggravated assault, aggravated battery, false imprisonment, and two counts of making a false statement.  *Id*. at 2-4.

Relevant here, Plaintiffs' Second Amended Complaint became the operative one by order of this Court on April 8, 2025.  R. Doc. 79.  On April 22, 2025, the City filed its latest motion to dismiss.  R. Doc. 86.  Plaintiffs now timely file their Opposition.

For judicial economy, there are four issues that can be removed from contention between the parties. First, Plaintiffs do not contest that this Court may consider the video and audio from body worn cameras ("BWC") in adjudicating this motion.  Cf. R. Doc. 86-1 at 3-4.  However, when doing so, the Eleventh Circuit has plainly held, "courts must construe all ambiguities in the video footage in favor of the plaintiff, as they must, at this stage, construe all ambiguities in the

---

[3] *See, e.g.* R. Doc. 80 (Amended Complaint) at ¶¶61, 63-69, 73 (allegations that Ferguson illegally stopped Carver Village residents and violated City policy by illegally detaining residents and showing City issued weapons, including his gun, so often that City officials held a community meeting and pulled Ferguson off the streets of Carver Village for a while, and Ferguson approached and questioned Mr. Lee in his own backyard as he was meditating).
[4] *Id.*, at ¶¶80-91.

written pleadings in the plaintiff's favor." *Baker v. City of Madison*, 67 F.4th 1268, 1277 (11th Cir. 2023). Second, after reviewing the case law cited by the City, Plaintiffs agree that the Georgia state law negligence claim in the Second Amended Complaint—Count X, R. Doc. 80 at ¶¶169-172—is precluded by sovereign immunity under state law. Plaintiffs accordingly agree that Count X only against the City should be dismissed. Third, the City argues there is no cause of action for any Fourteenth Amendment excessive force claim. R. Doc. 86-1 at 4-5. However, Plaintiffs makes no such claim—the constitutional excessive force cause of action is pled only under the Fourth Amendment. R. Doc. 80 at ¶¶99-104 (Count I).

Last, the City's motion does not seek dismissal of Counts III and X-XIII of the Amended Complaint, so these counts will not be addressed here. While a subsection of the City's motion vaguely states "claims" against the City under 42 U.S.C. §1983 should be dismissed, it never discusses the initial illegal stop and seizure of Mr. Lee prior to the use of any force, as pled in the facts and Count III. R. Doc. 80 at ¶13, ¶16, ¶18, ¶¶114-20.

## II.    Relevant Factual Allegations

Defendant Ferguson has a long history of using excessive force against black men, R. Doc. 80 at ¶¶42-58, including numerous complaints in Carver Village. *Id*. at ¶¶61-74. Indeed, before murdering Mr. Lee, Ferguson's behavior was so egregious that after a community meeting in March 2022 organized by the Savannah Police Department ("SPD") about excessive force incidents, SPD reassigned Ferguson from patrolling the neighborhood. *Id*. at ¶68. Unfortunately, SPD permitted him to quickly return to the Carver Village patrol. *Id*. In the four months prior to murdering Mr. Lee, Ferguson had at least **five** different use of force complaints. *Id*. at ¶¶66, 69-72.

3

On June 24, 2022, Saudi Lee was walking down the street in his neighborhood of Carver Village as he often did. *Id.* at ¶¶10-11. Mr. Lee was only thirty years old at the time of his death and because he had no felony record, was legally carrying his firearm. *Id.* at ¶¶38-39. When Ferguson and Randle saw this young black man potentially **legally** carrying a weapon, Randle and Ferguson conspired over their police radios to conduct an illegal stop and seizure of him. *Id.* at ¶13, ¶16 & ¶18. Mr. Lee was committing no crime,[5] there had been no call of someone who looked like him committing a crime, nor was there any constitutional basis to detain him. *Id.* at ¶13, ¶16, ¶18, ¶¶114-20. The reason for this pre-planned unconstitutional seizure was solely retaliation for Mr. Lee exercising his clearly established right under the federal constitution, Georgia constitution, and Georgia statute to bear arms. *Id.* at ¶¶119-24.

Nevertheless, Ferguson and Randle planned and executed an unlawful seizure of Mr. Lee's body. *Id.* at ¶¶16-18, 114-120. As Mr. Lee was legally walking down the sidewalk, committing no offenses, Ferguson and Randle drove up in their marked vehicles, surrounding him. *Id.* at ¶¶ 18-20. Mr. Lee submitted to their authority, and despite Georgia being an open carry state and *New York State Rifle & Pistol Association Inc. v. Bruen*, 597 U.S. 1 (June 23, 2022) having been handed down, he attempted to show Ferguson his permit to carry his gun. R. Doc. 80 at ¶21.

Without any provocation or reason, Ferguson targeted his yellow taser at Mr. Lee. *Id.* at ¶22. Knowing Ferguson's reputation for brutality and unjustified use of force, including having personally witnessed it, *id.* at ¶22 and citations to BWC therein, ¶¶65-74, Mr. Lee exclaimed in a panic, "You're about to kill me!" *Id.* at ¶22; R. Doc. 14, Exh. A at 1:44. Mr. Lee turned and fled away from Ferguson. R. Doc. 80 at ¶22 & citations to BWC therein. Of course, in Georgia, all

---

[5] When being interviewed about Mr. Lee's murder, Ferguson and Randle confected the post-hac explanation that they were stopping Mr. Lee for jaywalking. R. Doc. 80 at ¶ 16. However, as opposed to other states, there is no such crime as "jaywalking" in Georgia's law or in Savannah's municipal code. *See infra* at Point VI.C.1.

citizens have the statutory right to resist or flee an unlawful detention or arrest. *See Glenn v. State*, 310 Ga. 11, 24-26 (2020). Mr. Lee continued running away from Ferguson with his back turned to the officers. *Id*. at ¶23 & citations to BWC therein. Terrified for his life, Mr. Lee again called out, "You're about to kill me!" *Id*.; R. Doc. 14, Exh. A at 1:45. Mr. Lee never raised or pointed his weapon at anyone else. R. Doc. 80 at ¶24, R. Doc. 14, Exh. A. 1:44-1:47. He was running away from both officers down an empty street. R. Doc. 80 at ¶25 & citations to BWC therein.

After Mr. Lee had run past Randle and was heading across the street away from both officers with his back turned to them, *id.* at ¶¶23-25 and citations to BWC therein, Ferguson fired numerous shots at Mr. Lee. *Id*. at ¶26 and citations to BWC therein. A mere eleven (11) seconds had transpired from when Ferguson and Randle initiated this unconstitutional seizure of Mr. Lee and when they shot and killed him. *Id*. These shots hit Mr. Lee in the neck and back. *Id*. at ¶¶27, 29, 100. Civilian eyewitnesses yelled that Mr. Lee never pointed his gun at officers. *Id*. at ¶34.

When he was hit by the rounds from defendants, Mr. Lee's body violently crashed to the ground and the gun fell away from his hands. *Id*. at ¶27. Mr. Lee's limp body lay in the street with rivers of blood flowing from his back and neck. *Id*. at ¶¶28-29. Ferguson and Randle's BWC shows Mr. Lee struggling to breath—watching the video, any person can hear the blood gurgling out of the hole in his neck. *Id*. at ¶30. Neither officer approached Mr. Lee as a critical full **two minutes** passed as he lay in desperate need of medical care in the street. *Id.* at ¶33. With Ferguson and Randle idly watching, one minute after the shooting, Mr. Lee's body began to involuntarily spasm. *Id*. at ¶30. Citizens pleaded with Ferguson and Randle to provide medical care, but another full minute passed. *Id*. at ¶¶32-33.

Finally, two minutes after shooting Mr. Lee in the back, Ferguson laid a tiny piece of gauze over the blood-gushing wound he inflicted on Mr. Lee's neck. *Id.* at ¶33. Ferguson did not even

attempt to compress the neck or back wounds to halt the profuse bleeding. *Id*. at ¶33. Eventually, potentially life-saving minutes having passed from the shooting, Ferguson at last began chest compressions. *Id*. Claiming he was getting "tired," Ferguson stopped providing CPR so he could return to his vehicle to call the Southern States Police Benevolent Association to get representation for coming disciplinary proceedings. *Id*. at ¶35. Randle attempted further CPR, *id*. at ¶34, but by that time, it was too late, and Mr. Lee was dead as a result of Ferguson and Randle's plan to illegally detain him without reason. *Id*. at ¶13, ¶16 & ¶18, ¶¶114-120.

Mr. Lee never presented an immediate threat of serious physical harm to Ferguson, Randle, or anyone else. *See generally supra*; R. Doc. 80 at ¶¶99-101. During the more than two minutes where Mr. Lee lay helplessly in the street desperately needing medical care, he presented no risk of harm to anyone. *Id*. at ¶¶107-109.

## III.    Standard of Review

"For both 12(b)(6) and 12(c) motions we accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1297-98 (11th Cir. 2024). A complaint must "contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic v. Twombly*, 550 U.S. 544, 556 (2007); *see also id*. (allegations need only "be enough to raise a right to relief above the speculative level"). "When a federal court reviews the sufficiency of a complaint. . . its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (overturned on other grounds).

"While there may be a dispute as to whether the alleged facts are the actual facts, in reviewing the grant of a motion to dismiss, we are required to accept the allegations in the complaint as true." *St. Georgia v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002). In the context of qualified immunity, the Supreme Court has firmly cautioned against courts drawing any inferences from the evidence in favor of the defendants. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). In *Tolan*, the Supreme Court reviewed a Court of Appeals decision that upheld a summary judgment grant in favor of police officers based on qualified immunity. *Id*. When deciding summary judgment motions, "a court must view the evidence 'in the light most favorable to the opposing party.'" *Id*. at 656 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). This rule is analogous to the standard for motions to dismiss under Fed. R. Civ. P. 12(b) referenced above. *See Johnson*, 107 F.4th at 1297-98. In other words, this Court may not "weigh evidence" and resolve a dispute in favor of the defendants here. *Tolan*, 572 U.S. at 658.

When there is BWC, **any unclarity, ambiguity, or dispute about the contents of or inferences that may be drawn from the video** must be resolved in favor of Plaintiffs. *Baker*, 67 F.4th at 1277 (emphasis added). The Eleventh Circuit has written:

> We agree that, at times, videos do not paint the entire picture and may contain ambiguities that are subject to interpretation. There can be many reasons for that. Perhaps the video was shot from a bad angle, and thus the viewer cannot see all of the events as they unfold. Or perhaps the video contains a visual representation of what happened but does not contain crucial audio. When that is true, courts must construe all ambiguities in the video footage in favor of the plaintiff, as they must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor.

*Id*. It is only when BWC "**is clear and obviously contradicts the plaintiff's alleged facts**" that courts may credit the video instead of assuming all allegations in the pleading as true. *Id*. at 1277-

78 (emphasis added) (cited by *Johnson*, 107 F.4th at 1301). Though this law is plainly written in the very cases cited by the City, they omit it from their briefing. R. Doc. 86-1 at 3-4.

### IV.    Factual Characterizations Made Throughout the City's Motion Must Be Disregarded by this Court

The City's motion is replete with its own characterizations of the video labelled or asserted as "facts" to this Court. These characterizations are merely viewing the BWC in the **light most favorable to the defendants and making all inferences in favor of Ferguson and Randle** in direct contravention of long and well-established jurisprudence. *See supra* Point III.

For example, the City repeatedly claims the BWC depicts Mr. Lee "run[ning] in the direction of Randle" with his gun in the "low ready position and pointed in Officer Randle's direction." R. Doc. 86-1 at 2. However, Plaintiffs allege in the Amended Complaint that: (1) Mr. Lee never pointed his gun at anyone, including Officer Randle, and (2) at the time Ferguson shoots and kills Mr. Lee, he had already run well past Officer Randle and presented no threat to anyone. R. Doc. 80 at ¶¶22-26 & citations to BWC therein, ¶¶99-104. R. Doc. 14, Exh. A. 1:44-1:47. When BWC is not "**clear and obviously contradicts the plaintiff's alleged facts**," *Baker*, 67 F.4th at 1277, i.e. it is open to multiple interpretations, this Court "**must**" "construe all ambiguities in the video footage in favor of the plaintiff." *Id*. (emphasis added).

This is plainly the case here. Both an expert about law enforcement practices consulted by a local news station, Cliff Lent, and media observers have reviewed the BWC. These observers who are not associated with either party both concluded that Mr. Lee never pointed his gun at officers or "threatened use of imminent deadly force."[6] Similarly, the Chatham County District

---

[6] Flynn Snyder, "Law enforcement expert analyzes Saudi Lee body cam footage," WTOC, Dec. 6, 2024, available at: https://www.wtoc.com/2024/12/06/law-enforcement-expert-analyzes-saudi-lee-bodycam-footage/ (last visited Feb. 2, 2025) (quoting expert Cliff Lent); *The Current*, January 15, 2025, available at: https://thecurrentga.org/2025/01/15/city-of-savannah-lawyers-for-saudi-lee-accuse-each-other-of-potential-jury-tainting-in-lawsuit/ (last visited Jan. 16. 2025).

Attorney's Office had this BWC in its possession and having reviewed it, sought an indictment of Ferguson because his shooting of Mr. Lee was not reasonable or justified. R. Doc. 73-5. Grand jurors, having heard the evidence from the State, handed up an indictment charging Ferguson with murder, aggravated assault, aggravated battery, and false imprisonment. *Id*. Eyewitnesses on the scene proclaimed to Ferguson and Randle that Mr. Lee never pointed his gun at them. R. Doc. 80 at ¶34. Further, review of the BWC demonstrates that Plaintiffs' interpretation is not "clear[ly] and obviously" wrong, *Baker*, 67 F.4th at 1277, as it must be for this Court to credit the video over assuming the Plaintiffs' allegations as true. The following screenshots are sequential in time:









Screenshot from R. Doc 14, Exh. A at 1:54-1:56.  Mr. Lee's gun was pointed at the ground the entire time and he never pointed at or threatened Randle or anyone else.  Drawing all inferences and ambiguities in favor of the Plaintiffs, it cannot be said that the BWC proves Mr. Lee displayed "aggressive behavior," R. Doc. 86-1 at 6, or obviously contradicts the allegations in the Amended Complaint.  The City's characterization of this as an imminent threat is an issue for jurors, not summary judgment, or much less this case at the motion to dismiss stage.

Likewise, the City says Ferguson and Randle "approached" Mr. Lee.  Taking Plaintiffs' facts as true even with the BWC, Ferguson and Randle conspired over police radio to illegally seize Mr. Lee, R. Doc. 80 at ¶¶13, 16, 18, 114-20, boxing him in so he would not feel free to leave.  *Id*. at ¶¶19-21.  The City claims that BWC captures Mr. Lee saying, "You're going to have to kill

me." R. Doc. 86-1 at ¶¶2, 6. However, Plaintiffs allege in the Amended Complaint that the BWC shows Mr. Lee's words were, "You're about to kill me." R. Doc. 80 at ¶22-23.

Viewing the pleadings and BWC in the light most favorable to the Plaintiffs, as well as resolving all interpretations and ambiguities in favor of Plaintiffs, this Court must disregard the City's characterizations and conclusions of fact.

**V.    There is No Basis to Dismiss All Federal Claims Against the City Under *Heller* Because the City Does Not Argue There Are No Plausible Facts or Cause of Action for Count III, and Cannot Avoid Liability Due to Qualified Immunity**

The City's argument that that the municipal liability claims under §1983 asserted in the Amended Complaint should be dismissed under *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), may be quickly disposed of by this Court. *Heller* held that when a jury acquitted an officer of violating the Plaintiff's constitutional rights—and qualified immunity was not raised as a defense—that *Monell* claims against the municipality must necessarily fail because there was no underlying constitutional violation. *Heller*, 475 U.S. at 797-99. The Court explicitly noted the fact that qualified immunity was presented as a defense was crucial, as jurors had concluded no constitutional violation occurred period—not that one may have, but it was not clearly established at the time of the incident. *Id*. at 798-99.

Initially, the City never contests or seeks to dismiss Count III, which charges that Ferguson and Randle conspired to and did violate Mr. Lee's Fourth Amendment right to be free from unconstitutional seizure. R. Doc. 80 at ¶¶114-120. The Amended Complaint, citing the Fourth Amendment, plainly states that Ferguson and Randle "discussed, planned, and executed an unlawful stop and restraint on Mr. Lee's movement or public liberty." *Id*. at ¶120; *see also id.* at ¶116 ("Officers Ferguson and Randle conspired to unlawfully stop and seize Mr. Lee."). Even if the City were to prevail that there was no constitutional excessive force, the officers were not

11

deliberately indifferent to Mr. Lee's medical needs, and the defendants did not retaliate against Mr. Lee for exercising his Second Amendment rights, *see* R. Doc. 86-1 at 4-8, 10-12, the City never disputes the allegations that Ferguson and Randle conspired to violate Mr. Lee's "Second Amendment right to keep and bear arms when Officers Ferguson and Randle unlawfully stopped and seized him." R. Doc. 80 at ¶114. Thus, regardless of this Court's ruling, Count III alleging a constitutional violation by Ferguson and Randle will proceed making *Heller* inapposite.

Second, *Heller* is predicated up the jury's finding that there was no constitutional violation at all—not that there may have been, but the officer was entitled to the affirmative defense of qualified immunity. *Heller*, 475 U.S. at 797-99. In their pleading, the City urges that there is no cause of action as to Count V (retaliation for exercising Second Amendment rights) because qualified immunity could apply. R. Doc. 86-1 at 12 n.5. "Municipalities may not plead qualified immunity as a defense to §1983 violations." *Kentucky v. Graham*, 473 U.S. 159, 166-67 (1985). It is a defense only available to individual officers in their personal capacity. *Skrtich v. Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002). Even if law was not well-established at the time of the incident, if the officer committed an underlying constitutional violation, liability with the municipality under §1983 and *Monell* can still be found. *Arguendo*, if this Court held that qualified immunity applied to Count III, that does not mean there was not a constitutional violation that resulted from negligent hiring and responsibility (Count VI) or failure to train and supervise (Count VII). Unless this Court were to find no constitutional violation at all under Counts I & III, *Heller* does not preclude municipal liability even if the officers were entitled to qualified immunity.

VI.     **Viewing All Allegations as True and Drawing All Inferences in Favor of Plaintiffs, a Fourth Amendment Violation for Excessive Force has Been Properly Pled**

A.   **The Sole Question Before this Court is Whether Plaintiffs Have Pled a Constitutional Violation of Mr. Lee's Right to Be Free from Excessive Force**

As discussed above, municipalities may not raise qualified immunity to escape liability. *Graham*, 473 U.S. at 166-67; *Skrtich*, 280 F.3d at 1306.  Qualified immunity is an affirmative defense only available to individual law enforcement officers to avoid personal liability if the constitutional right violated against the Plaintiff has not been clearly established by the Supreme Court, the Eleventh Circuit, or the highest court of the relevant state.  *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019); *Skrtich*, 280 F.3d at 1306.  If an officer fails to raise the qualified immunity affirmative defense, it is waived for that stage of the proceedings.  *Skrtich*, 280 F.3d at 1306.  Since Ferguson and Randle each filed Answers rather than moving to dismiss on the basis of qualified immunity, R. Docs. 76 & 77, that defense is waived for Fed. Rule Civil Procedure 12(b) motion to dismiss purposes.  *Skrtich*, 280 F.3d at 1306-07.  Therefore, viewing all allegations in the Complaint as true and viewing the pleading and BWC, and any ambiguities or inferences therefrom, this Court need only determine whether Plaintiffs have "plausibly" pled a cause of action; not whether any constitutional right was clearly established at the time of the incident.  *See supra* Points III-IV.  Properly, the City does not urge this Court to dismiss based on whether there was clearly established law finding Ferguson and Randle's actions unconstitutional.

B.   **Under Eleventh Circuit Precedent, this Court is to Evaluate the Events Leading Up to Ferguson Shooting Mr. Lee to Determine its Reasonableness**

Plaintiffs agree that the "reasonableness" test set forth in *Graham v. Collins*, 490 U.S. 386 (1989), is appropriate here.  *See* R. Doc. 86-1 at 5.  However, the City critically omits that in the Eleventh Circuit, when assessing the reasonableness of an officer's action, this Court must look to

the events leading up to the use of force.[7]  *See Brown v. Hialeah*, 30 F.3d 1433, 1436 (11th Cir. 1994) ("In focusing on the totality of circumstances confronting officials at the time of arrest, the facts and circumstances surrounding the arrest include the full atmosphere at the time."); *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2023) (considering the thirty to forty-five seconds before the officer fired his weapon.  Recently, in *Ayers v. Harrison*, the Eleventh Circuit held an officer's argument that an "officer created danger" is precluded by Eleventh Circuit precedent was "both factually and legally incorrect" in that case.  650 Fed. Appx. 709, 719 (11th Cir. 2016).  There, an officer in an unmarked car approached a reverend with his gun drawn.  *Id*. at 712.  When the reverend put his car in reverse, he was shot and killed.  *Id.*  The Eleventh Circuit rejected the officer's argument that jurors should not have considered whether the officer's "own reckless conduct caused the risk that eventually led to the shooting."  *Id*. at 719.

### C.  Plaintiffs Have Pled a Plausible Violation of Mr. Lee's Fourth Amendment Right to Be Free of Excessive Force

Plaintiffs need only plead a plausible Fourth Amendment claim to defeat a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *See supra* Point III.  All facts pled must be assumed true, and any ambiguities in or inferences from the evidence must be construed in favor of Plaintiffs.  *Id*.  Only if BWC footage "**clear[ly] and obviously contradicts** the plaintiff's alleged facts" may this Court credit the video over the Amended Complaints' allegations.  *Baker*, 67 F.4th at 1277 (emphasis added).  In other words, while Plaintiffs agree this Court may consider BWC, this Court

---

[7] This issue was just argued before the Supreme Court in *Barnes v. Felix*, Docket No. 23-1329. The Fifth Circuit had judicially created a rule that a district court must only look at the "moment of threat," not the antecedent circumstances and happenings. *Barnes v. Felix*, 91 F.4th 393, 397 (5th Cir. 2024). While recognizing the precedent in the Circuit, Judge Higginbotham urged this doctrine has not been adopted by the majority of other Circuits. *Id*. at 400; *see also id*. at 400 n.13 (noting Eleventh Circuit is in majority requiring consideration of the facts that occur prior to use of force). In oral argument—which all media outlets concur in predicting the Court to overturn the Fifth Circuit—Justice Gorsuch commented that, "I think everybody agrees [the moment of threat doctrine] is wrong." *Barnes v. Felix*, 23-1239, Oral Arg. Tr. at 87 (available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2024/23-1239_4fbi.pdf).

14

may not "weigh" the evidence and "must" resolve a dispute or ambiguity in favor the defendants. *Tolan*, 572 U.S. at 658. For instance, in *Ayers*, the Eleventh Circuit found denial of an officer's summary judgment motion appropriate, even though he argued security footage was inconsistent with Plaintiff's deposition testimony. 650 Fed. App'x at 712. Since the footage did not "blatantly contradict" the non-moving party's version of event, summary judgment was not proper because "[e]ven with the video, the jury still had to make numerous and critical factual findings, including some based on credibility choices." *Id.*; *followed by Greene v. Cosco Shipping Lines Co. Ltd.*, 697 F. Supp. 3d 1362, 1378 (S.D. Ga. 2023). Here, Plaintiffs need not demonstrate that there are genuine facts in material dispute, but merely that they have pled a plausible constitutional claim.

Citizens are entitled to be free from excessive use of force by law enforcement authorities. *See, e.g.*, *Cantu v. City of Dothan*, 974 F.3d 1217, 1228 (11th Cir. 2020) (police may not use excessive, lethal force without warning when detaining an individual for a non-serious offense when he presents "no immediate threat of serious bodily or death"). "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). This rule applies even when a citizen flees from officers. *Id.* at 10 ("The use of deadly force to prevent escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than they escape."). The City correctly identifies the three factors the Supreme Court in *Garner* directed courts to consider when deciding if lethal force is constitutionally reasonable when used upon a fleeing person: (1) whether there is probable cause to believe that the suspect poses a threat of serious physical harm or death to officers or others, or s/he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) whether use of force was necessary to prevent escape; and (3) whether the officer gave warnings about the use of deadly force if reasonable. *Id.* at 11-12. *Accord* R. Doc. 86-1 at 5.

### 1.    Plaintiffs Have Sufficiently Pled that Ferguson Acted Unreasonably When Killing Mr. Lee Because He Did Not Present an Immediate Threat to Officers

The first *Garner* inquiry asks two questions, the second of which is both simple to answer and indispensable when evaluating the *Graham* reasonableness of Ferguson's actions.  Prior to being unconstitutionally detained by Ferguson and Randle,[8] Mr. Lee had committed no crimes at all, R. Doc. 80 at ¶¶13, 16, 18, & 119-24, much less one "involving the infliction or threatened infliction of serious physical harm."  *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013).  Presuming the truth of the Second Amended Complaint's factual allegations, Ferguson and Randle illegally conspired to conduct an unconstitutional stop and seizure of Mr. Lee.  R. Doc. 80 at ¶¶13, 16-18, 114-20.  This stop was motivated by Mr. Lee exercising his statutory and constitutional right to bear arms.  *Id*. at ¶¶119-24.

When being investigated about the shooting, Ferguson and Randle fabricated the false pretense that they stopped Mr. Lee because he was jaywalking by walking across the street in a zig-zagging manner. *Id*. at ¶16. First, when Mr. Lee was detained by Ferguson and Randle, he was walking on the sidewalk, not in the middle of the street. *Id.* at ¶20. *Cf. Brooks v. Miller*, 78 F.4th 1267, 1283 (11th Cir. 2023) (routine violations of traffic law do not justify use of force).  But even more fundamentally in assessing the reasonableness of Ferguson's actions, **jaywalking is not a crime in Georgia**.  Even though the City claims that Mr. Lee could have violated Georgia statutes, R. Doc. 86-1, n. 4, the Georgia Governor's Office of Highway Safety states on its website that what Ferguson and Randle claimed to have stopped Mr. Lee for was not a crime because he was merely crossing a street outside of a crosswalk while yielding to traffic.[9]

---

[8] Again, the City has not disputed Count III of the Amended Complaint which alleges the conspiracy to illegally detain Mr. Lee and violate his 2nd Amendment rights.
[9] Georgia Governor's Office of Highway Safety, "What GA Codes Say About Pedestrians," available at: https://www.gahighwaysafety.org/what-ga-codes-say-about-pedestrians/#:~:text=%C2%A7%2040%2D6%2D92.&text=%E2%80%9CJaywalking%E2%80%9D%20is%20n

Thus, at the time Ferguson murdered Mr. Lee, Mr. Lee had committed no crime at all—not even a misdemeanor. Indeed, even when Mr. Lee fled after having been unconstitutionally seized, he was merely exercising the long-recognized right in Georgia to resist an illegal detention. *Glenn v. State*, 310 Ga. 11, 23 (2020) (reiterating that "a person unlawfully arrested has a common-law right to escape from detention following an unlawful arrest"); *Long v. State*, 261 Ga. App. 478, 479 (2003) ("the defendant has the right to resist the unlawful arrest with all force reasonably necessary to prevent the arrest"). Instead, this entire situation was created by Ferguson and Randle's planned and executed decision to subject Mr. Lee to an unconstitutional stop. R. Doc. 80 at ¶¶13, 16, & 18.

Further, Plaintiffs have sufficiently pled that there was no "imminent threat of harm" to officers or any other person. *Harrigan v. Metro Dade Police Dep't Station #4*, 636 Fed. App'x 470, 474 (11th Cir. 2015). The Eleventh Circuit has long held that a citizen merely possessing a gun does not constitute a threat to officers such that lethal force is reasonable. *See, e.g.*, *Lundgren v. McDaniel*, 814 F.2d 600, 602 (11th Cir. 1987) (finding excessive use of lethal force where testimony indicated Plaintiff had a gun, and according to the officers, was "intent on using it on the deputies"); *Turk v. Bergman*, 685 Fed. App'x 785, 788-89 (11th Cir. 2017) (reversing grant of summary judgment where Plaintiff possessed a gun, but never pointed it at officers or made threatening moves); *Perez v. Suszczyniski*, 809 F.3d 1213, 1220 (11th Cir. 2016) ("[T]he mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit."); *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1326-27 (11th Cir. 2015) (reversing dismissal under Fed. R. Civ. P. 12(b)(6)

---

ot%20a%20legal,the%20pedestrians%20yield%20to%20traffic (last visited Feb. 3, 2025) (citing O.C.G.A §§40-6-90-92) (emphasis added).

even though police were responding to a call of a bipolar man who had a shotgun in his lap when officers found him).

Sister Circuits around the country have repeatedly come to the same conclusion. *See, e.g., Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1134-5 (8th Cir. 2020) ("A robust consensus of persuasive authority ... confirms that ... a person in possession of a firearm is not an immediate threat **unless he appears ready to shoot**.") (emphasis added); *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) ("(A)n officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon."); *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F. 4th 468, 480 (6th Cir. 2022) ("Under our precedent, possession of a weapon is not sufficient to justify the use of deadly force."); *George v. Morris*, 736 F.3d 829, 838-39 (9th Cir. 2013) (explaining that an officer's use of deadly force would be unlawful if it were true that an individual had a gun "trained on the ground' and was not making threatening gestures or "serious verbal threats"); *Rosales v. Bradshaw*, 72 F.4th 1145, 1152-53 (10th Cir. 2023) (denying qualified immunity, holding possession of a gun alone did not create a threat sufficient to justify the use of force); *McKenney v. Mangino*, 873 F.3d 75, 82, 84 (1st Cir. 2017) (holding the use of deadly force may be unconstitutional even when used on someone who is holding a gun); *Weinmann v. McClone*, 787 F.3d 444, 449-50 (7th Cir. 2015) (same); *Bennett v. Murphy*, 120 F. App'x 914, 918 (3d. Cir. 2005) (same).

When a weapon is present, this Court should look to "[w]here the weapon was, what type of weapon it was, and what was happening with the weapon" in assessing the reasonableness of deadly force. *Perez*, 809 F.3d at 1220. Plaintiffs have pled that Mr. Lee never raised his gun or pointed it at anyone. R. Doc. 80 at ¶24. He had already run past Randle without threatening him. *Id.* at ¶¶23-25. Mr. Lee had his back facing the officers as he ran

18

because he feared Ferguson was going to kill him, *id.* at ¶¶22-25, without ever turning to threaten the officers. *Id.* In short, there was no "imminent" risk of physical injury or death to Ferguson, Randle, or any other person as Mr. Lee ran down an empty street scared for his life. *Id.* Nevertheless, Ferguson shot Mr. Lee in the back and neck as he sprinted in the opposite of away from officers. *Id.*; *see also* R. Doc. 80 at ¶¶27-29, ¶100; R. Doc. 73-5 at 3-4, Counts 1 & 5.

Under Eleventh Circuit precedent, this Court may only decline to accept these facts as true at this stage if the BWC "clear[ly] and obviously contradicts the plaintiff's alleged facts." *Baker*, 67 F.4th at 1277. This is not the case—Mr. Lee never raised or pointed his gun at Ferguson or Randle. A grand jury of Chatham County jurors indicted Ferguson for murdering Mr. Lee, as well as for making the false statement that Mr. Lee pointed his gun at officers before running. R. Doc. 73-5 at 2-5 (Counts 1- 8). Journalists who reviewed the BWC state Mr. Lee never pointed his gun at officers at any point before being shot: "According to *The Current*'s review of the footage, it does show Lee with a handgun while running, **but it was not pointed at officers**."[10] Upon watching the BWC at the request of a news station, law enforcement expert Cliff Lent opined that Ferguson shot Mr. Lee "**without the threatened use of imminent use of deadly force present.**"[11] When resolving any unclarity or ambiguity in the video in favor of Plaintiffs, they have sufficiently pled a claim.

The City's arguments that Ferguson acted reasonably are all predicated upon inferences and interpretations viewing the factual allegations as false and interpreting all ambiguities and unclarities in the video in favor of the defendants—an inversion of our law. *See supra* Point III &

---

[10] Jake Shore, "City of Savannah, lawyers for Saudi Lee accuse each other of tainting potential jury pool," *The Current*, January 15, 2025, available at: https://thecurrentga.org/2025/01/15/city-of-savannah-lawyers-for-saudi-lee-accuse-each-other-of-potential-jury-tainting-in-lawsuit/ (last visited Jan. 16. 2025) (emphasis added).
[11] Flynn Snyder, "Law enforcement expert analyzes Saudi Lee body cam footage," WTOC, Dec. 6, 2024, available at: https://www.wtoc.com/2024/12/06/law-enforcement-expert-analyzes-saudi-lee-bodycam-footage/ (last visited Feb. 2, 2025) (emphasis added).

Point VI.C.  For instance, Plaintiffs plead that Mr. Lee exclaimed, "You are going to kill me!", while the City believes he said, "You are going to have to kill me." *Compare* R. Doc. 80 at ¶¶22-23 *with* R. Doc. 86-1 at 6.  The City characterizes Mr. Lee's behavior as "aggressive," R. Doc. 86-1 at 6, while Plaintiffs plead that the video demonstrates Mr. Lee never presented a threat to officers or acted aggressively.  R. Doc. 80 at ¶¶21-26.  Plaintiffs plead that screenshots of the video above show Mr. Lee's gun was always pointed at the ground so as never to present an imminent threat to officers, *id.*, while the City claims the gun is in "low ready position."  R. Doc. 80-1 at 2. Under plain Eleventh Circuit precedent, when there are disputes due to ambiguities, interpretation, or lack of clarity from the BWC, "courts must construe all ambiguities in the video footage in favor of the plaintiff, as they must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor." *Baker*, 67 F.4th at 1277.  *Accord Gregory v. Miami-Dade Cty.*, 719 Fed. App'x 859, 867 (11th Cir. 2017) (holding that when there are multiple interpretations of a citizen's movements and whether they constitute an imminent threat or not, the issue is properly for jurors, not decided at the summary judgment stage, much less the motion to dismiss one).

The cases placed in a string cite by the City, R. Doc. 86-1 at 6-7, are entirely distinguishable and fail to support dismissal at the pleading stage here.  For example, in *Jean-Baptiste v. Gutierrez*, the officer was on patrol when he was alerted of two suspects that had committed an armed burglary and armed robbery and fled in a red Dodge Neon—already evincing their dangers to others.  627 F.3d 816, 818 (11th Cir. 2010).  Soon after, the officer saw a vehicle matching that description travelling at a high rate of speed on the shoulder of the road running a red light.  *Id*. When the officer activated his sirens, the car fled at high speeds through traffic lights until it crashed.  *Id*.  Pursuing these violent crime suspects on foot, the officer suddenly encountered the two suspects **running towards him** holding an unknown object he believed to be a gun.  *Id*. at

20

819.  Only then did the officer use deadly force.  *Id*.  Similarly, in *Davis v. Edwards*, officers responded to a call of a mentally unstable man walking up and down a residential road yelling and waving a pistol around— presenting a clear threat to others.  779 Fed. App'x 691, 692-93 (11th Cir. 2019).  When officers approached the man and ordered him to keep his hands up, he moved his hand towards his back waistband.  *Id*.  When the man made this motion, he was facing the officers.  *Id*.

This case shares none of these essential facts.  Ferguson and Randle planned and executed an unconstitutional stop of Mr. Lee even though he had committed no crime.  The crime officers claim as a pretext for stopping him—walking in a street but not impeding traffic—is not a crime in Georgia.  Officers were not responding to a call of any crime, much less one involving a violent suspect.  Mr. Lee ran from the officers down an empty street, not drove a car recklessly endangering lives of others around him.  Plaintiffs plead sufficient facts that, when assuming all allegations in the Second Amended Complaint are true and giving them the benefit of all ambiguities or inferences, Mr. Lee was not an imminent threat.  Particularly when considering all the facts surrounding this incident—including the reason for the stop, not just the moment of shooting—Plaintiffs have satisfied their pleading burden.

### 2.  Deadly Force was Not Necessary to Prevent Escape

This factor indisputably militates in favor of Plaintiffs—the City does not even attempt to argue it.  As discussed at length above, Mr. Lee was committing no crime when Ferguson and Randle conspired to perform an unconstitutional stop and seizure of him in retaliation for his exercise of his Second Amendment rights.  Thus, there was no escape that Ferguson could have reasonably been preventing, particularly given Georgia citizens' right to resist and flee from unlawful detention.  *See supra*, Point VI.C.1.

### 3.  Ferguson Provided No Warning Prior to Shooting Mr. Lee

Likewise, the City cannot—and wisely does not—contend that Ferguson ever provided Mr. Lee with any warning prior to murdering him.  The BWC shows Ferguson failed to do so.

Plaintiffs have sufficiently pled a claim for excessive use of force under the *Garner* factors.

## VII.  Plaintiffs Have Sufficiently Pled that Ferguson and Randle Were Deliberately Indifferent to Mr. Lee's Medical Needs

The Fourteenth Amendment requires government officials to provide medical aid to individuals who have been injured during an arrest or otherwise apprehended by police.  *City of Revere v. Mass. Gen. Hosp.,* 463 U.S. 239, 244 (1983).  An officer may act with unconstitutional deliberate indifference by delaying the treatment of a serious medical need, *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), or "by failure to provide prompt attention to those needs by delaying necessary medical treatment for nonmedical reasons."  *Thomas v. Town of Davie*, 847 F.2d 771, 772–73 (11th Cir.1988).  "The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay."  *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015).  "When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference."  *Mandel v. Doe,* 888 F.2d 783, 789 (11th Cir.1989).

Deliberate indifference may also be inferred when an officer fails to justify or explain a delay in medical treatment.  *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir.1985) (finding that a jury could infer that the investigators' delay was deliberately indifferent because they provided no explanation for it).  The Eleventh Circuit has explained that evaluating a delay in providing medical attention for life-threatening injuries "is especially time-sensitive and

must ordinarily be measured not in hours, but in a few minutes." *Valderrama*, 780 F.3d 1108, 1120 (11th Cir. 2015) (emphasis added) (quoting *Bozeman*, 422 F.3d at 1273).

To plead a claim of deliberate indifference, Plaintiffs must allege that Mr. Lee suffered from an objectively serious medical need. *Id.* The City concedes this prong is satisfied. R. Doc. 86-1 at 7 n.3. Plaintiffs must also allege that subjectively, an officer was deliberately indifferent to that medical need. *Valderrama*, 780 F.3d at 1120. To do so, Plaintiffs must plead that: "(1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Valderrama*, 780 F.3d at 1116. In its motion, after reciting this standard, the City neglects to analyze the Second Amended Complaint under the specific prongs. Rather, in a single paragraph, the City merely mischaracterizes facts and asks this Court to draw untenable conclusions. R. Doc. 86-1 at 8. When properly analyzing this claim, it is apparent Plaintiffs have "ple[d] facts sufficient to show that [his] claim has substantive plausibility" and to inform the defendant of "the factual basis" for the complaint. *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (*per curiam*).

Viewing the allegations in the Second Amended Complaint as true and drawing all inferences in favor of Plaintiffs, there are sufficient allegations that the officers were deliberately indifferent to Mr. Lee's medical needs under the applicable law.

### 1. Ferguson and Randle Were Aware of Facts from which the Inference Could Be Drawn that a Substantial Risk of Serious Harm Existed

Just as the City does not dispute that shooting Mr. Lee created an objectively serious medical need, R. Doc. 86-1 at 7 n.3, they similarly cannot dispute the inference that a substantial risk of harm existed when Mr. Lee lay bleeding and convulsing in the middle of the street. R. Doc. 80 at ¶¶27-35, 105-113. Law enforcement officers are trained how to provide proper onsite

medical care, including while EMS arrives.  Ferguson and Randle, as shown in their BWC, observed the severity of the injury to Mr. Lee as "rivers of bright blood pour[ed] from his back and neck," *id*. at ¶29, "[s]ounds of blood gurgled out of the hole in his neck," *id*. at ¶30, and his body began to involuntarily spasm.  *Id*.

### 2.  Ferguson and Randle Drew the Inference Mr. Lee Was at Substantial Risk of Harm

Ferguson plainly drew the inference that a substantial risk of serious harm existed because he radioed for EMS seconds after shooting Mr. Lee in the back and neck.  R. Doc. 38, Exh. A at 01:57.  As their BWC capture, Ferguson and Randle saw Mr. Lee dying in front of their eyes, *id*. at 01:55 – 03:45, as eyewitnesses begged them to provide medical assistance.  R. Doc. 80 at ¶32. Ferguson and Randle's belated, utterly inadequate action, *id*. at ¶¶27-36, likewise demonstrates their subjective knowledge.

### 3.  The Officers Disregarded the Risk of Serious Harm

As alleged in the Second Amended Complaint, Ferguson and Randle waited a full two minutes before rendering any medical aid at all while Mr. Lee greatly suffered and bled out in the street, R. Doc. 80 ¶¶ 25-36, 105-113, in violation of his Fourteenth Amendment rights.  *See Wade v. Daniels,* 36 F.4th 1318, 1327 (11th Cir. 2022) (finding that the officers violated plaintiff's right by delaying medical treatment for his gunshot wounds for four minutes).  There was no justifiable reason for this delay.  R. Doc. 80 at ¶¶27-35, 105-113.  The City mischaracterizes Ferguson and Randles's response as "immediate[]," R. Doc. 86-1 at 8, while entirely ignoring the full two minutes the officers stood around after Mr. Lee was shot without attempting to stop the bleeding, offer CPR, or provide any other care.  Knowing that factually the description of "immediate" is entirely untenable, the City does not cite to the specific time of the shooting and the officers' (lack of) response.  As alleged in the Second Amended Complaint, Mr. Lee was shot at the 01:47

timestamp.  R. Doc. 80 at ¶26 n. 9   Ferguson walks up to remove Mr. Lee's handgun from the sidewalk, and then inexplicably kneels over him, lightly touching his shirt—but rendering no aid until 03:45.  *Id.* at ¶33.

During this time of deliberate inaction by the officers, Mr. Lee's body involuntarily convulsed in the street and his head rolled back, blood audibly gurgling out of his wounds—he was lifeless.  *Id.* at ¶30.  Even then, there was absolutely no compression applied to the wounds by either officer; rather, Ferguson tossed a tiny piece of gauze over a gushing bullet wound with the same level of force that a napkin is laid down at the supper table.  R. Doc. 80 at ¶33.  He *then* began chest compressions, *id.,* which only caused the wounds to bleed even more as no pressure was applied.  This "attempt" at care is so farcical that it amounts to no medical care at all. *Mandel,* 888 F.2d 789.  Further, Ferguson radioing for EMS is immaterial; any reasonable officer would know there would be a wait for an ambulance, yet Ferguson and Randle left Mr. Lee dying unattended in the street.  R. Doc. 80 at ¶¶33-36, 105-113.

Randle stood around and did nothing to provide aid to Mr. Lee after the shooting, until Ferguson "got tired" and decided to call to organize his own legal representation rather than assist in Mr. Lee's care.  *Id.*; *see also id.* at ¶¶32-35.  Mr. Lee perished in the middle of the street due to this inaction.  *Id.* at ¶¶36, 105-113.

### 4.  The Officers' Conduct Amounted to More than Gross Negligence

During the more than two minutes where Mr. Lee lay helplessly in the street desperately needing medical care, he presented no risk of harm to anyone.  *Id.* at ¶¶107-109.  As an unarmed man lay convulsing in the street, his body involuntarily spasming, and as neighbors begged the officers to do something, *id.* at ¶34, Ferguson and Randle did nothing.  The officers failed to give *any* care during a critical time where such care could have indeed saved Mr. Lee's life.  Even upon

offering "aid," it was grossly inadequate and disproportionate to the need.  Despite the ambulance

not arriving yet and Mr. Lee clearly still needing medical care, Ferguson disregarded this need to

coordinate his own representation in the coming investigation of this shooting.  *Id*. at ¶35.

Plaintiffs have sufficiently pled that Ferguson and Randle were deliberately indifferent to

Mr. Lee's medical needs in contravention of the Fourteenth Amendment.

**VIII.    Plaintiffs Have Properly Pled that Ferguson and Randle Unconstitutionally Retaliated Against Mr. Lee for Exercising His Right to Bear Arms under the Second Amendment and Georgia Law**

To state a retaliation claim under §1983, Plaintiffs must allege that: (1) Mr. Lee engaged

in protected activity; (2) he suffered a deprivation likely to deter future protected activity; and (3)

there is a causal connection between the defendants' decision to retaliate and Mr. Lee's protected

action.  *See Smith v. Mosley,* 532 F.3d 1270, 1276 (11th Cir. 2008) (*citing Bennett v. Hendrix*, 423

F.3d 1247, 1250 (11th Cir. 2005)).  Plaintiffs have met this standard when accepting the Second

Amended Complaint's factual allegations as true while construing all ambiguities and inferences

in favor of Plaintiffs, as this Court must.  *See supra* Point IV & VI.C.

**A.  Plaintiffs Have Pled that Mr. Lee Was Engaging in Protected Behavior**

The right to bear arms is one of our most sacredly held constitutional rights.  In *McDonald*

*v. Chicago*, the Supreme Court quoted St. George Tucker, who described the right to keep and

bear arms as "the true palladium of liberty" and explained that prohibitions on the right would

place liberty "on the brink of destruction."  561 U.S. 742, 769 (2010).

On the date Ferguson murdered Mr. Lee, both Georgia state law and the Supreme Court

unequivocally protected the right to carry his gun in public.  In 2022, Georgia legislators passed

"permitless carry" legislation that repealed longstanding requirements that people obtain a weapons permit in order to be eligible to carry concealed loaded firearms in public spaces.[12]

Further, the Supreme Court had already handed down[13] its decision *N.Y. State Rifle & Pistol Ass'nv. Bruen*, 597 U.S. 1 (2022).[14]   In the decision, the Court corrected lower court misinterpretations of its prior decisions in *McDonald* and *District of Columbia v. Heller*, 554 U.S. 570 (2008) that impermissibly limited citizens' long-solidified right of bearing arms for self-defense, without government interference.[15]  *Id.* at 32.   Yet, states such as New York continued to impose unconstitutional restrictions on this Second Amendment right.   *Bruen* corrected these mistaken interpretations of its prior decisions and again reaffirmed the Second Amendment guarantee to bear arms outside of the home in self-defense.  *Id.* at 32; *see also Heller*, 554 U.S. at 592 (striking down impermissible restrictions on the "individual right to possess and carry weapons in case of confrontation" under the Second Amendment).

The City's argument against this prong consists of its bare assertion that Mr. Lee was not carrying his gun for self-defense in their interpretation of the BWC.  R. Doc. 86-1 at 11.  However, as has been discussed at length above, this Court must accept the factual allegations in the

---

[12] 2021 GA SB 319; Ga. Code Ann. §§ 16-11-127(c); 16-11-125.1.

[13] This decision was handed down the day before Mr. Lee's murder. Since the issue was decided by the Supreme Court, it was definitively resolved for §1983 analysis.  *See Harrigan*, 636 Fed. App'x at 475 (repeated jurisprudential rule that a constitutional right is "clearly established" when it has been resolved by the Supreme Court).

[14] In its motion, the City claims that *Bruen* for the first time created the right to carry guns in public for self-defense. R. Doc. 86-1 at 10-11. This contention is bellied by the very language of the opinion itself.  *Bruen* never establishes itself as deciding an issue of first impression; rather it confirms that *Heller* and *McDonald* already recognized this right in various ways, and the Court was simply re-enforcing and clarifying a long-solidified right of bearing arms for self-defense, without government interference.  *Bruen*, 597 U.S. at 32.  In his concurrence, Justice Alito noted that "[o]rdinary citizens frequently use firearms to protect themselves from criminal attack and that "defensive firearm use occurs up to 2.5 million times per year."  *Bruen*, 597 U.S. at 74 (citing Brief for Law Enforcement Groups et al. as *Amici Curiae* 5).

[15] In its contention that *Bruen* announced a new rule, the City suggests that the officers here would be entitled to qualified immunity.  However, as discussed in Point VI.A, qualified immunity is only available for the individual officers to raise and both filed Answers here rather motions to dismiss, R. Docs. 76 & 77, thereby waiving any affirmative defense of qualified immunity at the pleadings stage of these proceedings.  *See Graham*, 473 U.S. at 166-67; *Skrtich*, 280 F.3d at 1306.

complaint as true and construe them in the light most favorable to the plaintiffs. *See supra* Points IV and VI.C.1. Plaintiffs allege that Mr. Lee was carrying his gun legally and practicing reasonable ownership. R. Doc. 80 at ¶¶10-11, 21, 38, & 114-15. The City again endeavors to characterize its interpretation of the video and certain words or actions as a reason this Court should dismiss the Second Amended Complaint. However, all of the inferences and interpretations stem from viewing the factual allegations as false and interpreting all ambiguities and unclarities in the video in favor of the defendants—again, is an inversion of our law. *See supra* Point III & Point VI.C. Since the specific facts argued by the City have already been addressed in Point VI.C, Plaintiffs incorporate their earlier response here.

### B. Plaintiffs Properly Allege that Mr. Lee Suffered a Deprivation Likely to Deter Future Protected Activity

At the outset, Mr. Lee is forever deprived of his rights and liberties because he was gunned down in the street as he ran away in fear for his life. Just as it would "be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity," *O'Boyle v. Sweetapple,* 187 F. Supp. 3d 1365, 1371 (S.D. Fla. 2016), it would be equally unjust to allow these Defendants to escape liability for permanently stripping Mr. Lee of these rights.

This "adverse effect element" is satisfied "if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of [their] rights." *Sweetapple,* 187 F. Supp. 3d 1371-72 (citing *Bennett,* 423 F.3d at 1254). There were numerous witnesses to this incident and its aftermath. R. Doc. 80 at ¶¶27-28, 32-34. These people were Mr. Lee's neighbors, residents of Carver Village. They cried out that Mr. Lee never pointed the gun at officers, asking the officers why they shot, begging them to help him. *Id.* at ¶¶ 32-34. Witnesses and community members gathered around Mr. Lee's lifeless body (from a reasonable and lawful

distance) and watched in horror as he bled out, convulsed, and died.  Unquestionably, every one of those individuals' right to bear arms will be chilled by witnessing this murder—a nearly thirty-one-year-old man shot dead in the street after police conspired to illegally stop him for exercising his rights under the Second Amendment and Georgia law.  *Id.* at ¶¶13, 16, 18, 119-24.  When looking to an "adverse effect," it does not matter how great the effect, or even that the protected activity is actually chilled, but rather simply that it would *likely* deter an ordinary citizen from exercising their right, as it would here.  "[T]he effect . . . may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable."  *Bennett,* at 1250-51 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)).  Notably the Defendants fail to address this point at all, nor do they attempt to even argue there was no deprivation at all.

While the City avers that Mr. Lee "set the confrontation into motion by stating 'you're going to have to kill me'"—an argument already made when Ferguson repeatedly lied to investigators, R. Doc. 80 at ¶41, and much more appropriate for closing at trial—Plaintiffs have adequately and properly alleged that Mr. Lee exclaimed, "You're about to kill me!" as he ran away in terror, holding his weapon down by his side in a non-threatening manner.  R. Doc. 80 ¶¶ 22. Mr. Lee only ever unholstered his firearm as an act of self-defense, *id*. at ¶¶22-23, and fled from an unlawful stop, *id*. at ¶¶16-26, which he had the legal right to resist "all force reasonably necessary to prevent the arrest." *Long*, 261 Ga. App. at 479.[16]

---

[16]  *See also Bacon v. State*, 347 Ga. App. 689, 690 (820 SE2d 503) (2018) ("A police officer is not discharging his lawful duties when he is making an unlawful arrest, and a person who resists an unlawful arrest does not hinder the officer in the lawful discharge of his official duties; see also, *Allen v. State,* 237 Ga. App. 744, 745 (3) (516 S.E.2d 788) (1999); *Smith v. Holeman*, 212 Ga. App. 158, 160 (3) (441 S.E.2d 487) (1994); *Mullis v. State*, 196 Ga. 569, 578-580 (5) (6) & (7) (27 S.E.2d 91) (1943).

29

To the extent the City again asks this Court to dismiss based on other (mis)interpretations and (mis)characterizations of certain portions of the BWC, for brevity, Plaintiffs again refer this Court to the prior section and earlier sections III and IV.C.1.

## C.  Plaintiffs Have Pled a Causal Connection Between the Defendants' Decision to Retaliate and Mr. Lee's Protected Action

There is no question Plaintiffs have pled a causal relationship between Ferguson and Randle's belief that Mr. Lee was carrying a gun—as was his right under the Constitution, statute, and clearly established case law—and their decision to illegally stop and detain him.  Plaintiffs repeatedly allege that Ferguson and Randle conspired to and actually did unconstitutionally seize Mr. Lee for exercising his Second Amendment rights. R. Doc. 80 at ¶¶13, 16, 18, 119-24.  Both admitted to investigators and wrote in their reports that they suspected Mr. Lee of carrying a firearm.  *Id*. at ¶¶ 15-16, 116, 119.  Both cited those facts as reasons for the stop.  Ferguson and Randle followed Mr. Lee, conspired to stop him for the pretextual reason of alleged "passenger in the roadway," repeatedly admitted they thought that Mr. Lee had a gun, and then surrounded him, boxed him in with their vehicles, and within seconds, drew a weapon on him.

It is well settled that "an act in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for different reasons, would have been proper." *Irvin v. Thomas,* No. 7:14-CV-00660-SLB, 2015 WL 4756389, at *5 (N.D. Ala. Aug. 11, 2015) (citing *Howland v. Kilquist,* 833 F.2d 639, 644 (7th Cir.1987)).  Under other circumstances and with different reasons, perhaps this claim would not be actionable, but as Plaintiffs properly alleged, the officers used the possibility of Mr. Lee carrying a gun as a reason for a stop–thereby retaliating against his constitutionally protected right.  The third prong is satisfied.

30

**IX.    Plaintiffs Have Properly Pled that Ferguson and Randle Unconstitutionally Seized Mr. Lee by Stopping Him in Public For No Legal Reason**

The City's endeavors to interpret the stop initiated by Ferguson and Randle on June 24, 2022, as a "consensual encounter," R. Doc. 86-1, at 9, and again asks this Court to interpret the BWC video contrary to the law. *See, supra, pp. 7-11* (When there is BWC, any ambiguity or dispute about the contents of, or inferences that may be drawn from, the video must be resolved in favor of Plaintiffs. *Baker*, 67 F.4th at 1277). Not only did twenty (20) grand jurors disagree with the City, *see, e.g.,* R. Doc. 73-5, at 3-4 (indictment for false imprisonment), Plaintiffs clearly pled that Ferguson and Randle violated Mr. Lee's constitutional right to be free from being stopped for no legal reason. R. Doc. 80, ¶¶121-132. Accepting the Second Amended Complaint's factual allegations as true while construing all ambiguities and inferences in favor of Plaintiffs, as this Court must, the City's motion to dismiss this claim fails.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny the City's Motion to Dismiss Plaintiffs' Second Amended Complaint.

Respectfully submitted, this 5th day of May, 2025.

WILLIAM R. CLAIBORNE
Georgia Bar Number: 126363
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
will@claibornefirm.com

MURELL LAW FIRM, LLC

*/s/ Christopher J. Murell*
Christopher J. Murell

Georgia Bar Number: 195116; Louisiana
Bar Number 32075
Meghan K. Matt*
Louisiana Bar Number: 39975
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297: Christopher
(225) 413-0463: Meghan
(504) 233-6691 Facsimile
chris@murell.law
meghan@murell.law
*Admitted pro hac vice

**ATTORNEYS FOR PLAINTIFFS**

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on all counsel of record and filed electronically with the Clerk of Court's CM/ECF system.

Respectfully submitted this 5th day of May, 2025.

<u>/s/ William Claiborne</u>
William R. Claiborne