IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JEROME BLIDGE; MARSHELL BERNICE LEE; and the ESTATE OF SAUDI ARAI LEE, | |
| Plaintiffs, | CIVIL ACTION NO.: 4:24-cv-00131 |
| v. | |
| ERNEST FERGUSON, In His Individual Capacity; MACKENZIE RANDLE, In His Individual Capacity; and CITY OF SAVANNAH, | |
| Defendants. | |

# O R D E R

This case arises from the June 24, 2022, shooting death of Saudi Lee. (Doc. 80.) The City of Savannah's Motion to Dismiss Plaintiffs' Second Amended Complaint is before the Court. (Doc. 86.) For the below reasons, the Court **GRANTS in part** and **DENIES in part** the City's Motion. (Id.)

## BACKGROUND

### I.    Plaintiffs' Allegations

Plaintiffs allege the following facts in their Second Amended Complaint ("SAC"). (Doc. 80.) On the morning of June 24, 2022, Officers Ernest Ferguson and Mackenzie Randle of the Savannah Police Department (the "Officers") were patrolling the Carver Village neighborhood of Savannah, Georgia, in their respective, marked police vehicles. (Id. at p. 3.) The Officers considered Carver Village a "high crime area." (Id.) At around 11:45 a.m., Saudi Lee was walking

in the neighborhood while carrying a concealed firearm.[1]  (Id. at pp. 3, 7.)  Ferguson and Randle planned to stop Lee and communicated the plan to each other over their police radios.  (Id. at pp. 3–4.)  Both Ferguson and Randle later stated to investigators and wrote in their reports that they suspected Lee of possessing a firearm.  (Id. at pp. 3, 29.)  Plaintiffs allege that, in post-shooting interviews, Ferguson and Randle "concocted" a charge of jaywalking as the legal justification for stopping Lee, stating they had seen Lee walking and zigzagging in the middle of the street.  (Id. at pp. 3, 28.)

Ferguson and Randle followed Lee and waited to stop him until he turned a corner and was "not visible in front of everybody."  (Id. at p. 4 (citing doc. 14-2 (Ferguson's Body Camera Footage)).)  At around 11:55 a.m., Ferguson "suddenly stopped [his] police vehicle . . . and engaged with [] Lee, who was walking on the sidewalk."  (Id.)  "[A]t the same time, Officer Randle then pulled up right behind where [] Lee stood, boxing him in."  (Id.)  Lee then "informed Ferguson that he had a legally permitted weapon and began to hand Ferguson his wallet with his right hand to show him the permit."  (Id.)  Plaintiffs state that, "[i]mmediately, Ferguson reached for his bright yellow taser and began to point it at [] Lee."  (Id.)  "At that point," Plaintiffs allege, Lee was "in fear for his life" given that he had "interacted with Ferguson on multiple occasions previously and ha[d] witnessed him stop and harass other Black residents of Carver Village."  (Id.)  Lee exclaimed "[y]ou're about to kill me!" and "turned and fled in the opposite direction of the officers."  (Id.)  "Within two seconds, Ferguson switched out his taser for his firearm."  (Id. at p. 5.)  "Randle then

---

[1]  Plaintiffs assert that Lee acted legally when carrying the concealed weapon.  (Doc. 80, p. 7.)  According to Plaintiffs, "[e]ffective April 12, 2022, Georgia permits any 'lawful weapons carrier' to carry handguns openly or concealed in most public spaces without any background check or permit required."  (Id.)  Plaintiffs add that, on June 24, 2022, Lee was carrying a concealed firearm permit even though a permit was no longer required.  (Id.)  As explained below, (see Background Section II, infra), the legality of Lee's firearm possession is not relevant to the Court's ruling.  The Court therefore does not address this issue.

immediately got out of his police vehicle and also drew his firearm." (Id.) Then, "[a]s Mr. Lee ran away, Ferguson fired multiple shots at Mr. Lee," hitting Lee's neck and left shoulder, and Lee collapsed to the ground. (Id.) "Only eleven seconds passed between the time Ferguson first stopped Mr. Lee on the sidewalk, and when Ferguson shot Mr. Lee." (Id.)

Plaintiffs allege that "a full two minutes passed after the shooting before either [officer] . . . rendered any type of medical aid [to Lee]," when Ferguson "laid a tiny piece of gauze on Mr. Lee's neck, never even compressing it down to stop the bleeding," and then "began chest compressions." (Id. at p. 6. (internal citations omitted).) Minutes later, Ferguson asked Randle to take over CPR because he was getting tired, at which point Ferguson went into his vehicle and called the Southern States Police Benevolent Association to arrange for representation in relation to the shooting. (Id.) Ferguson then ended the recording on his body camera. (Id. at p. 7.) Lee was later transported by ambulance to Memorial University Medical Center, where he was pronounced dead. (Id.)

The Court notes that the whereabouts of Lee's firearm during the shooting are difficult to discern from Plaintiffs' SAC. In providing their initial description of how Lee "ran away" from the Officers, the only reference Plaintiffs make to the firearm is their statement that "[a]t no point did [] Lee ever raise or point his weapon at the officers or anyone else." (Id. at p. 5.) Later in the SAC, Plaintiffs allege that Ferguson "lied" to investigators after the shooting by falsely claiming that "prior to turning to run, Mr. Lee pulled out his handgun and raised it at Ferguson." (Id. at p. 8.) Plaintiffs contend such claims are "disproven" by Ferguson's body camera footage which, according to Plaintiffs, shows that, "[while] Mr. Lee did hold his legally owned and carried firearm down by his side—clearly pointed at the ground—[he] never once . . . raise[d] it in the direction of anyone else, including the officers." (Id. at p. 9.)

3

Plaintiffs lastly allege that the June 24, 2022, shooting was caused by the Savannah Police Department's ("SPD") customs and practices regarding excessive force, officer training and supervision, and officer hiring and retention. (Id. at pp. 10–23.) First, Plaintiffs cite to "numerous articles published, investigations conducted, and lawsuits filed against [SPD]" to "demonstrate a practice and pattern of similar constitutional violations" which supposedly show that SPD had a "custom . . . that it is perfectly acceptable to use unnecessary and unwarranted violence against community members." (Id. at p. 18.) Second, Plaintiffs point to SPD employee complaints and surveys to support their allegation that SPD "fail[ed] to adequately train . . . its officers with respect to the manner and circumstances in which deputies are to use excessive force." (Id. at pp. 15–17.) And, third, Plaintiffs allege that SPD's decision to hire Ferguson, and to not discipline, demote, or terminate him for pre-shooting uses of force, likewise caused the shooting. (Id. at pp. 10–14.) Plaintiffs support these claims by stating that SPD's hiring procedures failed to uncover Ferguson's pre-SPD "problematic history in law enforcement," and that SPD's retention practices failed to adequately discipline him for pre-shooting misconduct. (Id.)

## II.    Body Camera Footage

Officer Ferguson and Officer Randle were both wearing body cameras during the June 24, 2022, shooting. (Doc. 14-2.)[2] The cameras captured audio and video footage that depicts much of the conduct underlying Plaintiffs' claims. (Id.) The footage proceeds, in relevant part, as follows.

Both body cameras start recording video at 11:54:07 a.m., and begin recording audio at 11:54:37 a.m. (Id.) From 11:54:37 to 11:55:40, both Officers sit on the driver's side of their

---

[2] A flash drive containing the footage from both Officers' body cameras was submitted as an exhibit docketed as and cited to herein as "Doc. 14-2." When necessary, the Court will specify in its citation which Officer's footage displays the described events.

respective vehicles, with mostly just the interior of the vehicle visible. (Id.) Both vehicles sit mostly stationary as the Officers have the following conversation over their radios, with both sides of the conversation being captured on each of the Officers' cameras:

> *Randle*: Walking back toward Gwinnett right now.
> *Ferguson*: Away from the group?
> *Randle*: Away from the group.
> *Ferguson*: Alright, let's go ahead and uh get him for pedestrian in roadway.
> *Randle*: You want to wait until he makes a turn so it's not like visible in front of everybody?
> *Ferguson*: Yeah.
> *Randle*: Alright. Still walking east. He just turned west.
> *Ferguson*: I have eyes on him. He goes in the store, he's done. He's not, alright let's go ahead and move in.

(Id. (both cameras at 11:54:37–11:55:13).) At this point, the Officers drive their vehicles down the street while continuing to communicate over the radio:

> *Randle*: Alright, I'm coming up from Carter.
> *Ferguson*: Alright. You pull ahead of him, I'll pull behind him.
> *Randle*: Where you at?
> *Ferguson*: He just crossed the street. I'm pulling up now.
> *Randle*: Okay. I'm turning on Gwinnett.

(Id. (both cameras at 11:55:13–11:55:28).) Both Officers stop their vehicles at about 11:55:40. Ferguson parks his vehicle at 11:55:40, after turning onto a street on his left and stopping his car on his left-hand side of that street, with a sidewalk cornering off immediately to the left of his driver-side door. (Id. (Ferguson Camera at 11:55:36–11:55:44).) Randle follows behind Ferguson. (Id. (Randle Camera at 11:55:30–11:55:55).) Randle keeps his vehicle on the original street from which the Officers have come and pulls over to his left-hand side of that street, before reaching the intersection onto which Ferguson turned. (Id. (Randle Camera at 11:55:40–11:55:53).) Randle parks his vehicle at 11:55:47, with the sidewalk running next to the driver's side of his car. (Id.) Together, the Officers' vehicles sit almost perpendicularly along the corner

of the sidewalk—with at least a car's-length of space separating the vehicles. (Id. (both cameras at 11:55:40–11:55:53).) The below still images depict the scene.

The following image is taken from Ferguson's body camera footage, as Ferguson is exiting his vehicle upon parking. (Id. (Ferguson Camera at 11:55:44).) The corner of Ferguson's opened driver-side door can be seen on the far right-hand side of the image. (Id.) Lee can be seen in the middle of the image, standing on the sidewalk, wearing a blue shirt and a backpack. (Id.) Randle's vehicle can be seen behind Lee, facing toward the camera, about to come to a stop along the sidewalk. (Id.)



(Id.) The below image is also taken from Ferguson's body camera footage, about seven minutes after the shooting. (Id. (Ferguson Camera at 12:02:44).) Ferguson and Randle's vehicles can be seen sitting adjacent to the sidewalk, unmoved, in the same positions where they came to rest about seven minutes beforehand. (Id.) When the Officers parked their vehicles, Lee was standing near the spot where a bicycle can be seen in the image below. (Id.; see also id. (Ferguson Camera at 11:55:44).) The grey truck, the white truck, and the police vehicle in the background were not present at the time of the shooting. (See id. (both cameras at 11:55:40–11:56:00).)

6



(Id. (Ferguson Camera at 12:02:44).)

At 11:55:41, Ferguson exits his driver-side door and Lee can be seen standing on the sidewalk, near where the sidewalk corners off.  (Id. (Ferguson Camera at 11:55:40–11:55:46).) From 11:55:42 to 11:55:47, while Randle's vehicle slows to a stop, Lee and Ferguson have the following exchange as Ferguson exits his car and stands about fifteen feet from Lee:

> *Ferguson*: What's up man?
> *Lee*: Everything good?
> *Ferguson*: Yeah, everything's good.
> *Lee*: Yeah, I'm about to go to the—about to go to the [inaudible].
> *Ferguson*: Okay.

(Id. (Ferguson Camera at 11:55:42–11:55:47).)  Lee then takes a wallet from his back pocket, extends the wallet toward Ferguson using his right hand, and takes a few steps in Ferguson's direction until the two are within arm's length of each other, stating "here's my uh, weapons license."  (Id. (Ferguson Camera at 11:55:46–11:55:50).)  Ferguson can be seen reaching and poised to accept the wallet with his left hand as he responds, "Your weapons license?  Where's it at?  Where's it at?" (Id. (Ferguson Camera at 11:55:49–11:55:51).)  At 11:55:50, as Ferguson asks these questions, Lee swiftly pulls the wallet back toward himself, transfers the wallet to his left hand, steps back, and uses his right hand to draw a handgun from a waistband holster that had been

7

concealed beneath his t-shirt.  (Id. (Ferguson Camera at 11:55:50–11:55:52).)  Lee is facing toward Ferguson, about five feet away, as he backpedals and begins drawing the gun.  (Id.)  Ferguson's body camera shows Ferguson draw his taser with his right hand as Lee draws the handgun, and, when Lee backpedals, Ferguson quickly transfers the taser to his left hand and uses his right hand to draw his own firearm.  (Id. (Ferguson Camera at 11:55:50–11:55:53).)  Lee, with his gun in his hand, turns and runs down the street in the direction from which the Officers came, while looking over his shoulder back toward the Officers.[3]  (Id. (Ferguson Camera at 11:55:52–11:55:55).)  As Lee runs, he passes near Randle's vehicle and Randle exits his vehicle and draws his firearm.  (Id. (both cameras at 11:55:50–11:55:55).)  At 11:55:55, once Lee has run about ten steps in this manner, Ferguson fires four shots at Lee and Lee collapses to the ground.  (Id. (both cameras at 11:55:55–11:55:57).)

About seven seconds after shooting Lee, at 11:56:02, Ferguson calls on his radio for emergency medical service ("EMS") and a supervisor.  (Id. (both cameras at 11:56:02–11:56:10).)  At 11:56:17, one of the Officers says, "Let's administer first aid," and Ferguson kneels over Lee and asks Randle to retrieve a pressure bandage from Ferguson's vehicle.  (Id. (both cameras at 11:56:17–11:56:28).)  Ferguson continues kneeling over Lee as Randle retrieves the bandage until 11:57:02, when Ferguson briefly stands to tell a gathering crowd of about a dozen people, some of whom are screaming and filming the scene, to stay back.  (Id. (Ferguson Camera at 11:56:28–11:57:13).)  At 11:57:19 Ferguson receives the bandage from Randle and begins removing it from its packaging.  (Id. (Ferguson Camera at 11:57:19–11:57:50).)  Once the bandage is unpacked, at 11:57:50, Ferguson kneels back down over Lee and places the bandage on a wound on Lee's neck.  (Id. (Ferguson Camera at 11:57:50–11:58:00).)  From 11:58:00 to 12:01:32, Ferguson performs

---

[3]  As Lee begins to turn away, he can be heard on Ferguson's camera footage saying something, but only the words "kill me" are clearly discernible.  (Doc. 14-2 Ferguson Camera at 11:55:51–11:55:54.)

chest compressions on Lee while Randle stands and monitors the crowd of onlookers.  (Id. (both cameras at 11:58:00–12:01:32).)  At 12:01:32, Ferguson tells Randle he is getting tired and asks Randle to take over CPR.  (Id. (Ferguson Camera at 12:01:30–12:01:34).)  Ferguson then stands alongside Randle while a crowd continues gathering and Randle performs CPR on Lee.  (Id. (both cameras at 12:01:34–12:02:30).)  At 12:02:30, one of several police officers newly arrived at the scene instructs Ferguson to sit in Ferguson's vehicle.  (Id. (Ferguson Camera at 12:02:26–12:02:38).)  Ferguson then walks to his vehicle and sits in the driver's seat.  (Id. (Ferguson Camera at 12:02:38–12:02:55).)  At 12:05:30, Ferguson uses his cell phone to call a police benevolent association, informs the operator that he has been involved in a shooting, and asks about arranging representation.  (Id. (Ferguson Camera at 12:05:00–12:07:30).)  At 12:10:44, while Ferguson is on hold, Ferguson's body camera stops recording.  (Id. (Ferguson Camera at 12:10:44).)

After Ferguson walks to his vehicle at 12:02:30, Randle continues performing CPR until one of the responding officers tells him to stop at 12:02:55.  (Id. (Randle Camera at 12:02:30–12:02:55).)  EMS arrives at the scene at 12:09:00 and begins performing chest compressions on Lee soon after.  (Id. (Randle Camera at 12:09:00–12:14:10).)  Randle remains on the scene until he enters a police vehicle, and his body camera stops recording at 12:21:03.  (Id. (Randle Camera at 12:21:03).)

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must . . . state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must "accept[] the allegations

in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft, 556 U.S. at 678. Rather, "[a] complaint must state a facially plausible claim for relief, and '[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Reese v. Ellis, Painter, Ratterree & Adams, LLP, 678 F.3d 1211, 1215 (11th Cir. 2012) (quoting Ashcroft, 556 U.S. at 678).

The plausibility standard is "not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft, 556 U.S. at 678 (internal quotation marks and citation omitted). Dismissal under Rule 12(b)(6) is also permitted "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); see also Neitzke v. Williams, 490 U.S. 319, 326–27 (1989) (explaining that Rule 12 allows a court "to dismiss a claim on the basis of a dispositive issue of law").

Under the "incorporation-by-reference doctrine," courts may properly consider body camera footage when ruling on a motion to dismiss if a plaintiff refers to the footage in their complaint, the footage depicts events central to the claims, and the authenticity of the footage is undisputed. Baker v. City of Madison, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)). In evaluating such footage, courts ruling on a motion to dismiss "must construe all ambiguities in the video footage in favor of the plaintiff." Id. at 1277

10

(citing Speaker v. U.S. Dep't of Health & Hum. Servs., 623 F.3d 1371, 1379 (11th Cir. 2010)). "But where a video is clear and obviously contradicts the plaintiff's alleged facts, [courts] accept the video's depiction instead of the complaint's account and view the facts in the light depicted by the video." Id. at 1277–78 (citing Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010); then citing Scott v. Harris, 550 U.S. 372, 381 (2007)).

## DISCUSSION

The Court finds that Counts V and X fail to state a claim against the City. However, because Plaintiffs have plausibly alleged a violation of Lee's Fourth Amendment right to be free from excessive force, Counts VI and VII survive dismissal insofar as they are based on that constitutional violation. For the reasons explained below, the City's Motion to Dismiss is thus **GRANTED in part** and **DENIED in part**. (Doc. 86.)

## I.   Count X against the City is Dismissed because the State Law Claim is Barred by Sovereign Immunity.

To begin with, the parties agree that Count X for negligence under Georgia law should be dismissed as to the City based on sovereign immunity. Under Georgia law, municipal corporations are generally "immune from liability for acts taken in performance of a governmental function." City of Atlanta v. Mitcham, 769 S.E.2d 320, 323 (Ga. 2015) (citing O.C.G.A. § 36-33-1(b)). Georgia courts have established that police personnel decisions and the provision of medical aid to those in police custody are "governmental functions," and thus protected by sovereign immunity. Id. at 324–25 ("[T]he care and treatment of individuals in police custody are purely governmental functions," therefore "there can be no action for damages against a municipal corporation for its failure to provide medical care."); Doss v. City of Savannah, 660 S.E.2d 457, 462 (Ga. Ct. App. 2008) ("Employment decisions, including the retention, hiring and supervision of employees, . . . . '[are] precisely the types of administrative action the discretionary function

exception seeks to shield from judicial second-guessing.'" (quoting <u>Ga. State Bd. of Pardons and Paroles v. Finch</u>, 605 S.E.2d 414, 416 (Ga. Ct. App. 2004))). Accordingly, there can be no Georgia law action for damages against a city for negligent performance of those functions.

Despite this rule, Plaintiffs brought Count X for "[n]egligence under Ga. Code § 51-1-2 against Officer Randle and the City," alleging the City breached its duties to "properly screen[] individuals who apply to be peace officers, . . . keep[] dangerous officers off the street, and . . . provid[e] its officers with the necessary [medical] materials." (Doc. 80, pp. 37–38.) The City argues the Court should dismiss Count X against it on grounds that it is "entitled to sovereign immunity because both employment decisions and the medical care provided to individuals in police custody are purely governmental functions." (Doc. 86-1, p. 14.) In their Response, Plaintiffs state that, "after reviewing the case law cited by the City, Plaintiffs agree that the Georgia state law negligence claim in the Second Amended Complaint . . . is precluded by sovereign immunity . . . . [and] agree that Count X only against the City should be dismissed." (Doc. 94, p. 3.) The Court therefore **GRANTS** the City's Motion to Dismiss to the extent that the Motion seeks dismissal of Plaintiff's Georgia law negligence claim against it. (Doc. 86.) Though Count X as alleged against Officer Randle[4] remains pending, Count X is **DISMISSED** as to the City. (Doc. 80.)

## II.   Count V against the City is Dismissed because Plaintiffs Have Failed to Plausibly Allege a Deprivation of Lee's Second Amendment Rights.

Count V is a 42 U.S.C. § 1983 claim against both the City and Officers Ferguson and Randle, alleging "Retaliation Against Mr. Lee for Exercising His Second Amendment Right to Bear Arms." (Doc. 80, pp. 31–32.) In <u>Monell v. Department of Social Services of City of New</u>

---

[4] Unlike Officer Randle, Officer Ferguson is not named in Count X. (<u>See</u> doc. 80, pp. 37–38.)

York, the United States Supreme Court established that municipalities like the City can only be held liable under Section 1983 in limited circumstances.  436 U.S. 658, 701 (1978).  A plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021) (quoting McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004)).  Count V alleges that the City permitted a custom that led Ferguson to shoot Lee "in retaliation for exercising his Second Amendment rights."  (Doc. 80, pp. 31–32.)  The City argues Count V should be dismissed because Plaintiffs have failed to state a claim for "Second Amendment retaliation" and, therefore, have failed to plausibly allege a violation of Lee's constitutional rights—the first requirement for a Monell claim.  (Doc. 86-1, pp. 10–12.)  The Court agrees.

Plaintiffs contend that, under New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1, 1 (2022), Lee's possession of a firearm during the June 24, 2022, shooting was Second Amendment protected activity.  (Doc. 94, pp. 4, 27.)  Count V thus alleges that, when Ferguson shot Lee, he did so in retaliation for Lee exercising this constitutional right.  (Id. at p. 30; doc. 80, pp. 31–32.)  The Court is only aware of the Eleventh Circuit Court of Appeals having recognized a Section 1983 retaliation claim in the context of the First Amendment.  To succeed on that type of action, a plaintiff must show: (1) he engaged in constitutionally protected speech; (2) an official took adverse action against him and the allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) a causal connection exists between the retaliatory conduct and the protected speech.  Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008).

The City contends that, even assuming these requirements apply to a retaliation claim in the context of the Second Amendment, Count V fails the first and third elements of this standard. (Doc. 86-1, pp. 10–11.)  Additionally, and more fundamentally, however, the City vehemently challenges whether a "Second Amendment retaliation" claim is cognizable in the first place.  (Id. at pp. 11–12.)  The City asserts that no legal authority supports the notion, underlying Count V, "that a police officer's use of excessive force on an individual bearing a firearm could be considered retaliation against the individual's exercise of his or her Second Amendment right." (Id.)  The City acknowledges that Supreme Court rulings have recognized a constitutional right to publicly carry firearms for self-defense,[5] as Plaintiffs contend Lee was doing when the shooting occurred.  (See id.)  However, the City argues, those cases "dealt solely with . . . [the] regulation of firearms," and they did not create a cause of action under the Second Amendment whenever a claimant happens to be "carrying a firearm at the time of his or her arrest or detainment."  (Id. at p. 12.)  In their Response, Plaintiffs maintain that Count V satisfies each element of the Eleventh Circuit's retaliation standard.  (Doc. 94, pp. 26–30.)  Plaintiffs do not, however, directly address the City's contention that Second Amendment retaliation is not a cognizable claim—instead simply assuming the retaliation framework laid out in First Amendment cases is equally applicable to other constitutional rights.[6]  (See id.)

---

[5]  In this regard, Plaintiffs cite to McDonald v. City of Chicago, 561 U.S. 742, 742 (2010); District of Columbia v. Heller, 554 U.S. 570, 570 (2008); and New York State Rifle & Pistol Ass'n, 597 U.S. at 1.

[6]  In what is seemingly the closest they come to addressing this argument, Plaintiffs characterize the City as contending that "there is no cause of action as to Count V . . . because qualified immunity could apply." (Doc. 94, p. 12.)  Plaintiffs are correct in suggesting that the Officer's potential qualified immunity cannot be the basis for dismissing Plaintiffs' Monell claims against the City.  See Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) ("[T]he doctrine of qualified immunity [only] protects a public official from liability for money damages in his or her individual capacity . . . ." (alterations adopted) (quoting Harvey v. Blake, 913 F.2d 226, 228 (5th Cir. 1990))).  However, this does not resolve whether Second Amendment retaliation is a cognizable claim.

The Court agrees with the City and finds that Section 1983 does not provide a cause of action for Second Amendment retaliation. Accordingly, Count V fails to allege a constitutional violation regardless of Plaintiffs' appraisal of the facts under the three-part retaliation framework from First Amendment cases. The Court is unaware of any cases that have directly considered whether (much less have expressly held that) the rights enshrined in Bruen, 597 U.S. at 1, create an individual cause of action under the Second Amendment when, as alleged here, an officer uses excessive force on a person in retaliation for publicly carrying a firearm for self-defense. Other courts in this circuit, however, have declined to recognize a general Second Amendment claim based on authority similar to Bruen.

In Howe v. City of Enterprise, for instance, officers responded to a late-night disturbance at a home and the homeowner, suspecting a break-in, answered the door while wielding a handgun—prompting the officers to shoot him. No. 1:15-cv-113, 2018 WL 8545947, at *4–5 (M.D. Ala. Sept. 17, 2018). The homeowner subsequently brought a Section 1983 suit against the officers, alleging they shot him "for lawfully exercising his Second Amendment right," under the Supreme Court's holdings in Heller and McDonald, "to possess a firearm . . . in his own home." Id. at *33. The Middle District of Alabama ruled this was not a cognizable claim and granted the officers' motion to dismiss. Id. at *34. The court was persuaded by opinions from courts in other circuits that had reasoned that Heller and McDonald could not create such a cause of action because those cases involved "local ordinances" rather than "an individual city officer's unique conduct" and therefore "offer[ed] little guidance in this context where the circumstances pit an individual's Second Amendment rights to carry a weapon . . . against an officer's rights to safely conduct [an] investigation." Id. at *33–34 (first quoting Schaefer v. Whitted, 121 F. Supp. 3d 701, 710–11 (W.D. Tex. 2015); then citing Heyward v. Tyner, No. 2:17-cv-01545, 2017 WL 9673667, at *7

15

(D.S.C. Nov. 29, 2017); and then citing <u>Spry v. West Virginia</u>, No. 2:16-cv-01785, 2017 WL 440733, at \*7 (S.D. W. Va. Feb. 1, 2017)).  The district court accordingly found that the Fourth Amendment, not the Second Amendment, was the proper vehicle for challenging the officers' alleged use of excessive force.  <u>Id.</u>  The court thus "decline[d] to convert an excessive force claim into a separate Second Amendment claim simply because [the homeowner] allege[d] that he was shot for having a gun on his property."  <u>Id.</u> at \*34.

Here, for the same reasons, the Court declines to recognize a Second Amendment retaliation claim against the City.  Like the homeowner in <u>Howe</u>'s right to possess a handgun, the parties agree that—under <u>Bruen</u>—the Second Amendment protected Lee's right to publicly carry a loaded weapon for self-defense.  However, as with the Supreme Court cases that were discussed in <u>Howe</u>, <u>Bruen</u> offers little guidance in this case because that case concerned challenges to a state's restriction of firearms, not to an individual officer's unique conduct.  <u>See Bruen</u>, 597 U.S. at 71 (holding a New York regulatory scheme was unconstitutional).  The Fourth Amendment, not the Second Amendment, therefore remains the proper vehicle for Plaintiffs to challenge Ferguson's alleged use of excessive force.

Plaintiffs do not alter this outcome by framing Count V as a "retaliation claim."  Though <u>Howe</u> did not specifically reference the Eleventh Circuit's First Amendment retaliation standard, the homeowner's claim in that case that officers "shot him 'for lawfully exercising his Second Amendment right,'" <u>Howe</u>, 2018 WL 8545947, at \*33, is essentially the same as Plaintiffs' claim here that "Ferguson used force against [Lee] . . . in retaliation for exercising his Second Amendment right," (doc. 80, p. 31).  Further, citing the same considerations put forth in <u>Howe</u>, courts in other circuits have rejected the suggestion that an officer's alleged use of excessive force can give rise to a cause of action for Second Amendment retaliation.  <u>See Heyward</u>, 2017 WL

9673667, at *6 (Plaintiff's claim that officer shot him because he was exercising Second Amendment rights was "akin to a retaliation claim," and due to be dismissed because proper vehicle for claim was Fourth Amendment excessive force); Schaefer, 121 F. Supp. 3d at 710 n.3 ("[T]o the extent [p]laintiff intends to press a claim under § 1983 for retaliation under the Second Amendment, his claim still fails.").

The lone opinion the Court has uncovered entertaining the possibility of a Second Amendment retaliation claim, Thomas v. Cassia County, likewise does not change the Court's conclusion. No. 4:17-cv-00256, 2019 WL 938385, at *1 (D. Idaho Feb. 26, 2019). The claimant in Thomas brought a Second Amendment retaliation claim against a police officer who had arrested him, presumptively, on suspicion of hit and run. Id. at *1–3. The District of Idaho court saw no issue assessing the claim under the applicable standard for First Amendment retaliation and denied the officer's motion for summary judgment. Id. at *10–12. However, unlike here, the facts in Thomas allowed that court to recognize a Second Amendment cause of action without usurping the role of the Fourth Amendment. Indeed, the allegedly retaliatory conduct in Thomas was an officer's decision to execute an arrest, not his use of force. Id. Further, the Thomas claimant was not armed when the alleged retaliation occurred—he argued the arrest was "motivated by the [officer's] desire 'to retaliate against . . . his *prior* exercise of his Second Amendment right[s].'"[7] Id. at *10 (alterations adopted) (emphasis added). Plaintiffs' claim here, on the other hand, involves an officer's use of force on an armed civilian. Accordingly, unlike in

---

[7] Furthermore, even if Count V were a cognizable claim (and acknowledging that Thomas concerned a motion for summary judgment rather than a motion to dismiss), the claim would not survive. The allegations in Thomas provided a much stronger indication of causal connection than Plaintiff's allegation here. Indeed, the officer in Thomas had aggressively confronted the claimant for legally carrying firearms several times prior to the arrest and had stated after the arrest that "it would be nice to get a conviction because then we could get [the claimant's] guns." Thomas, 2019 WL 938385, at *1.

Thomas, allowing a Second Amendment retaliation claim here would improperly preempt the role of the Fourth Amendment's objective reasonableness standard—which remains the proper tool for weighing "an individual's Second Amendment rights to carry a weapon . . . against an officer's right[] to safely conduct [an] investigation," Howe, 2018 WL 8545947, at *33–34 (quoting Schaefer, 121 F. Supp. 3d at 710–11).  Count V therefore fails to plausibly allege a violation of Lee's constitutional rights.  Because it thus cannot satisfy the first requirement of a Monell claim, Count V is **DISMISSED** as to the City.

**III.     Counts VI and VII Survive Dismissal to the Extent they are Based on the Alleged Violation of Lee's Fourth Amendment Right to be Free from Excessive Force.**

Two federal claims remain pending against the City: Count VI for "Municipal liability under 42 U.S.C. § 1983 Negligent Hiring and Retention;" and Count VII for "Municipal liability under 42 U.S.C. § 1983 Failure to Train and Supervise."  (Doc. 80, pp. 32–35.)  Again, to successfully state these Monell claims, Plaintiffs must plausibly allege: (1) that Lee's constitutional rights were violated; (2) that the City had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the custom or policy caused the violation.  Underwood, 11 F.4th at 1333 (quoting McDowell 392 F.3d at 1289).  Unlike Count V, Counts VI and VII lack any affirmative allegations identifying a particular violation of Lee's constitutional rights.  (Doc. 80, pp. 33–35.)  These Counts, instead, allege only that the City's deliberately indifferent customs of "Negligent Hiring and Retention" and "Failure to Train and Supervise," respectively, caused Lee's death.  (Id.)  For Count VI and VII's constitutional-deprivation requirement, both parties direct the Court to constitutional violations that Plaintiffs allege in their Section 1983 claims against the Officers—Counts I, II, and IV.[8]  (See, e.g., doc. 94,

---

[8]  Though this approach is somewhat questionable, the City does not suggest that the SAC is an improper pleading under Fed. R. Civ. Pro. 8(a).  To the contrary, the parties share a single, definite understanding of

pp. 14–22 (arguing Plaintiff's Monell claims should survive dismissal based on constitutional deprivation alleged in Count I).)  Count I, against Ferguson, contends Lee's Fourth Amendment right to be free from excessive force was violated when Ferguson shot him.  (Doc. 80, pp. 25–26.) Counts II and IV are each against both Ferguson and Randle: Count II alleges the Officers violated Lee's Fourteenth Amendment right to receive medical care by being deliberately indifferent to his medical needs,[9] (id. at pp. 26–27); and Count IV alleges the Officers violated Lee's Fourth Amendment right to be free from unreasonable searches and seizures by "detaining and questioning Mr. Lee without reasonable articulable suspicion or probable cause a crime had been committed,"[10] (id. at pp. 29–31).[11]

The City argues that, in light of the undisputed body camera footage, Counts I, II, and IV each fail to plausibly allege the Officers deprived Lee of any constitutional rights.  (Doc. 86-1, pp. 4–10.)  Therefore, the City avers, Counts VI and VII against the City should be dismissed because the SAC contains no underlying constitutional violations that satisfy the first requirement of those

---

Plaintiffs' pleadings.  Because it is therefore clear that the SAC gives the City adequate notice of the claims against it, the Court assesses Counts VI and VII in the same manner as the parties do in their filings.

[9] In the SAC, Plaintiffs pled in Count II that Lee was deprived of his "Fourth Amendment" right to receive medical aid.  (Doc. 80, p. 27.)  In their Response to the Motion to Dismiss, however, Plaintiffs argue that Count II concerns Lee's rights under the *Fourteenth* Amendment.  (Doc. 94, pp. 22–26.)  For purposes of ruling on the City's Motion to Dismiss only, the Court construes the SAC in the light most favorable to Plaintiffs and, considering that it explicitly alleges a violation of Lee's right to receive medical aid, the Court considers Count II as alleging a violation of Lee's Fourteenth Amendment rights.

[10] In the SAC, Plaintiffs allege Count IV under both the Fourth Amendment and the Fourteenth Amendment.  (Doc. 80, pp. 29–31.)  The City correctly asserts in its Motion that only the Fourth Amendment governs whether the Officers and Lee's interactions were an unconstitutional seizure.  (Doc. 86-1, pp. 5–6.)

[11] Plaintiffs also allege, in Count III against Officers Ferguson and Randle, that the Officers "Conspir[ed] to Violate Mr. Lee's Constitutional Rights Under the Second, Fourth, and Fourteenth Amendments."  (Doc. 80, pp. 28–29.)  However, Count III cannot satisfy the first element of Plaintiffs' Monell claims because it does not allege a distinct constitutional violation suffered by Lee.  Rather, Count III merely offers another theory of liability against the Officers for inflicting constitutional injuries already alleged in the other counts.

Monell claims.  (Id.)  Plaintiffs, on the other hand, contend that Counts VI and VII against the City should survive dismissal because each of the Section 1983 claims against the Officers plausibly alleges constitutional violations.  (Doc. 94, pp. 13–26, 31.)  Though Plaintiffs agree that the Court can consider the body camera footage, they maintain that dismissal is unwarranted because the footage does not clearly and obviously contradict the relevant allegations of the SAC, and the Court "must construe all ambiguities in the video footage in favor of the plaintiff." [12]  (Id. at pp. 2–3 (citing Baker, 67 F.4th at 1277).)

As an initial matter, the parties are correct that the Court may consider the body camera footage in evaluating the City's Motion to Dismiss given that the footage is central to Plaintiffs' claims and its authenticity is undisputed.  Baker, 67 F.4th at 1276–77 (under the "incorporation-by-reference doctrine," courts may properly consider body camera footage when ruling on a motion to dismiss if the plaintiff refers to the footage in their complaint, the footage depicts events central to the claims, and the authenticity of the footage is undisputed); see also Johnson v. City of Atlanta, 107 F.4th 1292, 1298–1301 (11th Cir. 2024).  While Plaintiffs are right that the Court "must construe all ambiguities in the video footage in favor of the plaintiff," the law also dictates that "where a video is clear and obviously contradicts the plaintiff's alleged facts, [courts] accept the video's depiction instead of the complaint's account, and view the facts in the light depicted by the video."  Baker, 67 F.4th at 1277–78 (internal citation omitted).

---

[12]  Plaintiffs also mention that "an expert about law enforcement practices consulted by a local news station . . . and media observers [who] have reviewed the [body camera footage] . . . concluded that Mr. Lee never pointed his gun at officers or 'threatened use of imminent deadly force.'" (Doc. 94, p. 8.)  Further, Plaintiffs state that: "[T]he Chatham County District Attorney's Office had this [body camera footage] in its possession and[,] having reviewed it, sought an indictment of Ferguson . . . [in relation to] his shooting of Mr. Lee;" and "Grand jurors, having heard the evidence from the State, handed up an indictment charging Ferguson with murder, aggravated assault, aggravated battery, and false imprisonment." (Id. at pp. 8–9.) The Court does not consider any of this extrinsic evidence in assessing the City's Motion.

A review of the SAC and body camera footage—even when viewed in the light most favorable to Plaintiffs—reveals that Count II for deliberate indifference to medical needs, and Count IV for unreasonable seizure, both fail to plausibly allege a constitutional violation. However, viewing the footage in the light most favorable to Plaintiffs, the Court finds Count I successfully states a claim for a constitutional violation. Counts VI and VII thus survive dismissal—but only insofar as those counts are based on Count I's allegation that Lee was deprived of his Fourth Amendment right to be free from excessive force. Part III.A and Part III.B, infra, explain why the allegations in Counts IV and II, respectively, fail to plausibly allege a violation of Lee's constitutional rights. Part III.C, infra, explains why Count I, on the other hand, plausibly alleges a Fourth Amendment violation that can sustain Plaintiffs' Monell claims at the motion to dismiss stage. Accordingly, for the reasons more fully explained below, the City's Motion to Dismiss is **DENIED** as to Counts VI and VII (though, again, only to the extent that those counts are based on Count I's allegation that Lee was deprived of his Fourth Amendment right to be free from excessive force).

> **A.    Count IV fails to plausibly allege the Officers violated Lee's Fourth Amendment right to be free from unreasonable searches and seizures during the initial encounter.**

Count IV against Officers Ferguson and Randle alleges that, before the shooting, the Officers violated Lee's Fourth Amendment right to be free from unreasonable searches and seizures by "detaining and questioning Mr. Lee without reasonable articulable suspicion or probable cause a crime had been committed." (Doc. 80, p. 31.) The City argues Count IV fails to plausibly allege a constitutional violation because the initial encounter between Lee and the Officers was not a "seizure" under the Fourth Amendment. (Doc. 86-1, pp. 8–10.) The Court

agrees.  Count IV's constitutional allegations therefore cannot satisfy the first requirement of Plaintiffs' Monell claims.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. Amend. IV. Courts have accordingly established that the Fourth Amendment only allows police officers to "seize" a person if probable cause or reasonable suspicion makes the seizure "reasonable." See Terry v. Ohio, 392 U.S. 1, 8–9 (1968).  However, "[n]ot all interactions between law enforcement and citizens" qualify as "seizures" that "implicate the scrutiny of the Fourth Amendment." U.S. v. Jordan, 635 F.3d 1181, 1185 (11th Cir. 2011).  "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may [a court] conclude that a 'seizure' has occurred." Id. (quoting Terry, 392 U.S. at 19 n.16).  On the other hand, no seizure occurs during "police-citizen exchanges involving no coercion or detention," where "a reasonable person would feel free to terminate the encounter." Id. at 1185–86 (quoting United States v. Perez, 443 F.3d 772, 777–78 (11th Cir. 2006)).  "In these consensual encounters, the officers need no suspicion because the Fourth Amendment is not implicated." United States v. Knights, 989 F.3d 1281, 1286 (11th Cir. 2021) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991)).

Plaintiffs allege in Count IV that Officers Ferguson and Randle violated Lee's Fourth Amendment right against unreasonable seizures when they parked their vehicles and approached him on the sidewalk.  (Doc. 80, pp. 29–31.)  According to Plaintiffs, this initial approach was a seizure because "[n]o reasonable person in Mr. Lee's position would have felt free to leave . . . since the[] officers surrounded him in marked vehicles and gave him verbal orders . . . . [and] were armed . . . . [and] Mr. Lee had previously interacted with Ferguson and knew his history of illegal

seizures and excessive force in the neighborhood." (Id. at p. 30.) Plaintiffs contend that this alleged seizure lacked reasonable suspicion or probable cause because, though the Officers reportedly suspected Lee of possessing a firearm and jaywalking, neither of those activities are a crime under Georgia law. (Id. at p. 31.)

The City argues, in the first instance, that the Officers' initial approach could not have violated Lee's constitutional rights because it did not constitute a seizure. (Doc. 86-1, pp. 8–10.) According to the City, the body camera footage shows that "neither Ferguson nor Randle informed Mr. Lee that he was being stopped due to a suspicion of criminal activity or that he was not free to go," but rather "th[e] initial encounter between Mr. Lee and Ferguson was seemingly amicable at first and Ferguson did not 'by means of physical force or show of authority . . . restrain [Mr. Lee's] liberty.'" (Id. at pp. 9–10.) Further, the City asserts, even if the Officers' approach were subject to Fourth Amendment scrutiny, they had reasonable suspicion to seize Lee for jaywalking—which, despite Plaintiffs' contentions, the City maintains is a crime. (Id. at p. 9.)

Regardless of whether reasonable suspicion or probable cause existed, the initial encounter did not violate Lee's constitutional rights because, even viewing the video footage in the light most favorable to Plaintiffs, there is no basis for a reasonable jury to find that Lee had been seized. The test for distinguishing consensual encounters with police from seizures subject to Fourth Amendment scrutiny asks whether "a reasonable person would feel free to . . . terminate the encounter." United States v. Hunter, 798 F. App'x 511, 515 (11th Cir. 2020) (quoting United States v. Drayton, 536 U.S. 194, 202 (2002)). This is a "totality of the circumstances" standard for which the Eleventh Circuit has held there are several "[r]elevant factors." Id. Those factors, which "are not all-encompassing and should not be applied rigidly," include:

> (1) whether the individual's path is blocked or impeded; (2) whether identification is retained; (3) the individual's age, education and intelligence; (4) the length of the

23

individual's detention and questioning; (5) the number of police officers present; (6) the display of weapons; (7) any physical touching of the suspect; and (8) the language and tone of voice of the police.

Id. (citing Jordan, 635 F.3d at 1186). "An officer's display of his badge and the presence of a uniform and holstered firearm are accorded little weight in the analysis, as the public knows that most officers are armed and are often required to wear uniforms." U.S. v. Allen, 447 F. App'x 118, 120 (11th Cir. 2011) (citing Perez, 443 F.3d at 778 n.2). "Ultimately, a Fourth Amendment 'seizure' only occurs when a person's freedom of movement is restrained by means of physical force or by submission to a show of authority." Id.

Notably, the "reasonable person" inquiry is an objective standard and the parties' subjective beliefs as to the encounter are irrelevant in determining whether there was a seizure. See Hunter, 798 F. App'x at 571 (citing Michigan v. Chesternut, 486 U.S. 567, 574 (1988)). Accordingly, the allegations suggesting Lee *subjectively* believed he was not free to leave—like Plaintiffs' contention that Lee shouted "[y]ou're about to kill me," and was "in fear for his life"— carry no weight in the analysis. Likewise, whether the Officers intended to detain Lee is also irrelevant, unless they conveyed that intention to him. See, e.g., U.S. v. Mendenhall, 446 U.S. 544, 554 n.6 (1980) ("[T]he subjective intention of the DEA agent in this case to detain the respondent, had she attempted to leave, is irrelevant [to whether a seizure occurred] except insofar as that may have been conveyed to the respondent."). The standard is purely whether an objectively reasonable person in Lee's circumstances would think they were seized.

Here, in light of the clear video footage and the applicable legal authority, no reasonable person would have a basis for believing that the initial encounter with the Officers was a seizure. The United States Supreme Court has established that, under the reasonable person test, "[a] seizure does not occur simply because a police officer approaches an individual and asks a few

24

questions." Bostick, 501 U.S. at 434; see also United States v. Jordan, No. 1:08-CR-369, 2009 WL 10670328, at *4 (N.D. Ga. Oct. 6, 2009) ("The fact that the officers stopped their vehicle and one or both of them exited to speak to defendant did not cause the encounter to become a seizure . . . . [considering that t]he officers were not behaving in a threatening or coercive manner."); United States v. Cade, 93 F.4th 1056, 1061 (7th Cir. 2024) (no seizure where "police officers park[ed] a police vehicle in a public street to approach pedestrians on foot").

In United States v. Hunter, a sheriff's deputy stopped his marked police cruiser in the street, approached a pedestrian walking alongside the road, informed the pedestrian he was investigating a robbery, and asked the pedestrian where he was going. 798 F. App'x at 513. Though the pedestrian argued the deputy "demonstrated a 'show of authority' when he exited the vehicle, approached [the pedestrian], and began asking questions," the Eleventh Circuit found the initial approach was not a seizure. Id. at 516–17. The court cited Supreme Court authority for the principle that law enforcement officers do not implicate the Fourth Amendment "merely by approaching individuals on the street . . . and putting questions to them if they are willing to listen." Id. at 516 (quoting Drayton, 536 U.S. at 200). The court observed that, in approaching the pedestrian, the deputy "did not brandish his weapon, block or impede [the pedestrian's] path, ask [the pedestrian] for identification, or touch him." Id. Rather, the deputy "remained calm throughout the encounter, never threatening [the pedestrian] or raising his tone of voice, and asked reasonable questions regarding [the pedestrian's] presence in the area and his destination." Id. Because the deputy therefore did not "'by means of physical force or show of authority' restrain [the pedestrian's] liberty," his initial approach was not a seizure and did not require reasonable suspicion or probable cause under the Fourth Amendment. Id.

In <u>United States v. Allen</u>, two officers "exited their vehicle [and] approached" a jaywalker, one officer "identified himself as an Atlanta Police Officer and said that he needed to talk," and the jaywalker told the officer he had a gun.  No. 1:09-CR-94, 2010 WL 11507509, at *2 (N.D. Ga. Feb. 5, 2010).  On appeal of the district court's determination that no seizure had occurred, the Eleventh Circuit affirmed that "the initial encounter, which lasted a matter of seconds," was not a seizure because "the officers did not restrain [the jaywalker's] freedom of movement by means of physical force or a sufficient show of authority."  447 F. App'x at 121.

The video footage here makes clear that, before Ferguson's use of force, this was simply an encounter where an officer approached a pedestrian in public.  Under the Eleventh Circuit and Supreme Court precedent, there is no basis for this encounter to be deemed a seizure under the Fourth Amendment.  While Plaintiffs contend that "[n]o reasonable person in Mr. Lee's position would have felt free to leave," alleging that the officers "surrounded Mr. Lee with their marked police vehicles . . . . [and] commanded that Mr. Lee stop for questioning" with "verbal orders," (doc. 80, p. 30), the Officers' clear and obvious body camera footage contradicts this characterization.  (<u>See</u> doc. 14-2.)  As depicted by the footage, the initial encounter at issue only lasted about twelve seconds.  (<u>Id.</u>)  The video shows the encounter begin when Officers Ferguson and Randle park their vehicles on the street alongside the sidewalk that Lee was standing on.  (<u>Id.</u>)  After parking, Officer Ferguson exits his vehicle and, contrary to Plaintiffs' "verbal order" allegation, has a brief, conversational exchange with Lee: Ferguson says "what's up" and tells Lee that "everything's good."  (<u>Id.</u>)  Lee volunteers where he is "about to go" and, without being prompted, offers to show Ferguson his "weapons license."  (<u>Id.</u>)  There are no special circumstances that would support finding that this was a seizure.  The exchange was very brief; there were only two officers present; other than their typical, holstered firearms, the Officers did

not display any weapons; the Officers did not physically touch Lee; and Ferguson's language and tone of voice was conversational, rather than threatening or coercive. (Id.) Indeed, there is even less evidence of coercion here than in the consensual encounters described in Hunter and Allen. Whereas the officers in those cases told a pedestrian they were investigating a crime and asked them questions about where they were going (in Hunter), and (in Allen) told the pedestrian upon approaching him that they "needed to talk," here Ferguson merely asked Lee "what's up" and told him "everything's good." Accordingly, the Officers did not seize Lee "merely by approaching [him] on the street . . . and putting questions to [him]." Hunter, 798 F. App'x at 516 (quoting Drayton, 536 U.S. at 200).

Further, though the Officers parked their vehicles near where Lee stood on the sidewalk, neither the vehicles nor the Officers themselves blocked or impeded Lee's path such that the otherwise consensual encounter was transformed into a seizure. See Chesternut, 486 U.S. at 575 ("While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure."). Courts applying the reasonable person standard have found that a pedestrian walking in a public place is not "blocked or impeded" when a police cruiser stops alongside him so long as the pedestrian can walk around the cars. See, e.g., United States v. Thomas, 160 F.4th 1177, 1182–83 (11th Cir. 2025) (finding initial encounter was not a seizure based on video evidence that officers' vehicle was not blocking individual's walking path). As the screenshots above depict, the clear body camera footage shows that Lee had a wide, easily navigable path around both the Officers and their vehicles[13]—indeed, Lee utilized that path when he fled from the officers. (See docs. 14-2 & 14-3.)

---

[13] (See Background Section I, supra.)

Furthermore, regardless of the "reasonable person" standard, the fact that Lee ran from the Officers negates the possibility that the initial encounter was a seizure.  Though the City fails to raise the argument in its Motion, a seizure requires not only a show of authority that would make a reasonable person feel they cannot leave, but also that the person actually *submits* to that authority.  United States v. Brown, 852 F. App'x 524, 526 (11th Cir. 2021) ("A seizure by means of a show of authority requires both a show of authority and submission to that authority" such that an officer's conduct toward an individual "actually 'produce[s] his stop.'" (quoting California v. Hodari D., 499 U.S. 621, 626 (1991))).  The Eleventh Circuit has thus established that "[w]hen a suspect flees from the police, he is not submitting to their authority and therefore is not seized." Jordan, 635 F.3d at 1186.  It is undisputed that Lee ran from the Officers.  Plaintiffs nevertheless claim that Lee "submitted himself to questioning"—apparently during the few seconds between Ferguson's approach and Lee's flight.  (Doc. 80, p. 30.)   However, even accepting this interpretation of the encounter, Lee's temporary compliance would not satisfy the "submission" requirement of a seizure.  Courts regularly find that an individual is not seized when he momentarily complies with a show of authority before fleeing.  United States v. Perkins, No. 5:22-cr-00254, 2023 WL 9118748, at *5–7 (N.D. Ala. Oct. 16, 2023) (collecting cases), adopted, 2023 WL 8715826 (2023), aff'd 2025 WL 2977639 (11th Cir. 2025); see also U.S. v. Baldwin, 496 F.3d 215, 218 (2d Cir. 2007) ("[T]o comply with an order to stop—and thus to become seized—a suspect must do more than halt temporarily . . . ."); U.S. v. Smith, 575 F.3d 308, 315 (3rd Cir. 2009) ("[M]omentary compliance [is] not enough to trigger a seizure . . . .").  The initial encounter was thus not a seizure, not only because it fails the "reasonable person" standard but also because Lee fled from the Officers.

For these reasons, Count IV's allegation that the initial encounter violated Lee's Fourth Amendment right to be free from unreasonable seizures, when considered alongside the video footage, fails to state a claim for relief—meaning, in turn, that Plaintiffs cannot reference Count IV to satisfy the "constitutional deprivation" requirement of their Monell claims in Counts VI and VII.

**B.      Count II fails to plausibly allege the Officers violated Lee's Fourteenth Amendment right to receive medical care.**

Next, Count II against Officers Ferguson and Randle alleges that Lee was deprived of his Fourteenth Amendment[14] right to receive medical care after being injured by police because the Officers did not personally treat Lee's gunshot wounds "for at least two minutes." (Doc. 80, pp. 28–29.) The City argues Count II fails to plausibly allege a constitutional violation because the body camera footage shows that the Officers called EMS within seconds of the shooting, and began rendering first aid soon after. (Doc. 86-1, pp. 7–8.) Once more, the Court agrees. Count II's constitutional allegations therefore cannot satisfy the first requirement of Plaintiffs' Monell claims.

The Due Process Clause of the Fourteenth Amendment requires government officials to "provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983). "To succeed on a claim for deprivation of medical care, a plaintiff must prove (1) the existence of an objectively serious medical need, and (2) that the officer was deliberately indifferent to that need." Wade v. Daniels, 36 F.4th 1318, 1326 (11th Cir. 2022) (citing Valderrama v. Rousseau, 780 F.3d 1108, 1116 (11th Cir. 2015)). Here, there is no dispute that Lee's gunshot wound created an objectively serious

---

[14] Plaintiffs originally pled Count II under the Fourth Amendment in the SAC, then changed to Fourteenth Amendment in their Response. (Compare doc. 80, pp. 26–27, with doc. 94, pp. 22–26.) In the light most favorable to Plaintiffs, the Court assumes for purposes of this Order that Count II intends to allege a Fourteenth Amendment violation.

medical need.  (See doc. 86-1, p. 7 n.3 ("The City of Savannah does not dispute that the Amended Complaint adequately alleges the existence of an objectively serious medical need.").)  The issue is whether the Officers were "deliberately indifferent" to that need.   To show deliberate indifference, a plaintiff must plausibly allege "(1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence."  Wade, 36 F.4th at 1326 (citing Valderrama, 780 F.3d at 1116).

Plaintiffs allege that the Officers' conduct constituted deliberate indifference to Lee's medical needs.  (Doc. 80, pp. 26–27.)  Plaintiffs state that the Officers inferred that Lee was at a substantial risk of serious harm upon viewing him suffer gunshot wounds.  (Id. at p. 26.) According to Plaintiffs, the Officers disregarded this risk by "d[oing] nothing for two minutes," even though a reasonable police officer would have known Lee's injuries required immediate treatment.  (Id. at pp. 26–27.)  The City concedes that the Officers inferred Lee's wounds created a substantial risk of harm, arguing in its Motion only that Plaintiffs fail the third and fourth requirements for plausibly alleging deliberate indifference.  (Doc. 86-1, pp. 7–8.)  The City asserts that the Officers "did not disregard Mr. Lee's serious need for medical attention and certainly did not act in a grossly negligent manner," because the body camera footage shows they immediately called EMS and, just after, treated Lee with a compression bandage and by administering CPR. (Id. at p. 8.)

Even considering the body camera footage in the light most favorable to them, Plaintiffs have failed to allege the Officers deprived Lee of his constitutional right to medical care.  A claimant cannot plausibly allege deliberate indifference to medical needs when, immediately upon

suffering injuries, officers request EMS and begin working to personally provide aid. Courts in this circuit have repeatedly held that officers satisfy their constitutional obligation to provide medical care so long as they summon EMS within a reasonable time after a shooting. See Peacock v. Smith, No. 5:18-cv-00284, 2018 WL 5649899, at *6–7 (M.D. Ga. Oct. 31, 2018) (no deliberate indifference to medical needs when officers requested EMS eight seconds after shooting suspect); McKee v. Montiel, No. 6:21-cv-1085, 2024 WL 2879114, at *8 (M.D. Fla. May 3, 2024) (no deliberate indifference to medical needs when officers requested EMS one minute and thirty-two seconds after shooting); Houston v. Galluzzi, No. 6:18-cv-708, 2019 WL 2492113, at *3–4 (M.D. Fla. June 14, 2019) (no deliberate indifference to medical needs when officers requested EMS "more than three minutes" after shooting). In fact, the Court is unaware of any authority suggesting that, once officers seek medical care by requesting EMS, the Constitution requires them to *personally* render *any* medical aid. See Peacock, 2018 WL 5649899, at *7 ("[N]o binding courts have ever held that police officers are required to personally render aid to injured persons, in addition to immediately summoning EMS . . . ."); McKee, 2024 WL 2879114, at *8 ("In the Eleventh Circuit, several district courts have held that an officer is not required to personally provide medical care.") (collecting cases); see also City of Revere, 463 U.S. at 245 ("[The city] fulfilled its constitutional obligation by seeing that Kivlin was taken promptly to a hospital that provided the treatment necessary for his injury."). Moreover, even when officials delay in requesting care, this only tends to demonstrate a constitutional violation when the delay is considerable enough to cause harm, is unexplained, and there is a suggestion that the delay was deliberate. Valderrama, 780 F.3d at 1118–19 (claim only survived summary judgment when jury could have found officers delayed EMS, waiting three minutes to call and lying about nature of injury, to spend time concocting story that would justify deadly force); Bozeman v. Orum, 422

F.3d 1265, 1272–73 (11th Cir. 2005) (claim survived summary judgment only when officials waited fourteen minutes before requesting or administering aid to person who was unconscious from asphyxiation); contra Houston, 2019 WL 2492113, at *4 ("[H]owever much 'delay' there might have been prior to the call, there are no allegations that the delay was intentional or done for some nefarious purpose.").

Plaintiffs' allegation that the Officers "did nothing for two minutes" is clearly and obviously contradicted by the body camera footage.  The footage shows that, within seconds of shooting Lee, Ferguson called for EMS.  (See doc. 14-2.)  Then, a few seconds later, Ferguson told Randle to retrieve a compression bandage for Lee's wounds.  (Id.)  Randle ran to retrieve the bandage from Ferguson's vehicle while Ferguson monitored the scene and the gathering crowd; as soon as Randle returned, Ferguson worked to open the bandage and applied it to Lee's wounds. (Id.)  For the next few minutes, as they awaited EMS, the Officers continued performing CPR until Randle was instructed to stop by a responding officer.  (Id.)  This footage thus establishes that, under applicable law, the Officers provided Lee with sufficient medical care to satisfy Lee's Fourteenth Amendment rights.  Because Count II therefore fails to plausibly allege a deprivation of Lee's constitutional rights, Plaintiffs cannot reference Count II's allegations to satisfy the constitutional-deprivation requirement for their Monell claims against the City.

### C.      Count I plausibly alleges Ferguson violated Lee's Fourth Amendment right to be free from excessive force.

Count I, against Officer Ferguson, alleges that Lee was deprived of his Fourth Amendment right to be free from excessive force when Ferguson shot him.  (Doc. 80, pp. 25–26.)  Unlike the initial encounter, Ferguson's use of deadly force on Lee was a seizure and is thus subject to the Fourth Amendment's objective reasonableness standard.  Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness

requirement of the Fourth Amendment.").   "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).  To assess whether the force applied was "objectively reasonable in light of the facts confronting the officer," courts generally consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396.  As to deadly force specifically, the Supreme Court's opinion in Tennessee v. Garner, 471 U.S. at 1, dictates that an officer may use deadly force consistent with the Fourth Amendment when the officer:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm"; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

Morton, 707 F.3d at 1281 (quoting McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir. 2009)).  Courts considering whether deadly force was constitutional "must be careful to evaluate the reasonableness of an officer's conduct 'on a case-by-case basis from the perspective of a reasonable officer on the scene . . . .'"  Penley, 605 F.3d at 850 (quoting Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993))

Here, Count I alleges that Ferguson's use of deadly force violated Lee's Fourth Amendment rights because "no reasonable officer could have believed that Mr. Lee posed any immediate threat of serious physical harm or death to any person" considering that, at the time of the shooting, Lee was "r[unning] away in the opposite direction of the officers, with his back facing

33

the officers." (Doc. 80, p. 26.)  The City argues in its Motion that Count I fails to plausibly allege a constitutional deprivation.  (Doc. 86-1, pp. 5–7.)  According to the City, the body camera footage shows "Lee, in a matter of seconds, unholster[] his gun, back[] away from Ferguson with the gun in his hand[,] state[] 'you're going to have to kill me,'" and look in Officer Randle's direction with the gun in the "low-ready" position.  (Id. at p. 6.)  Therefore, the City contends, "it was reasonable for Ferguson to believe that [Lee] intended on engaging in a shootout with him and Officer Randle," meaning "Ferguson's use of force was reasonable under the circumstances, [and] Plaintiffs' claims against the City of Savannah should be dismissed to the extent . . . [they are] based on a violation of Mr. Lee's Fourth Amendment rights."  (Id. at pp. 6–7.)  On the other hand, Plaintiffs allege that, notwithstanding that Lee had drawn a firearm, he "was well past the officers by the time he was shot and clearly not a threat," and was "running for his life."  (Doc. 80, pp. 9, 5.)

The body camera footage does not so clearly contradict the Amended Complaint's allegations that the Court can ignore Plaintiffs' allegations that no reasonable officer could have believed that Lee posed an immediate threat at the time of the shooting.[15]  Therefore, at this motion to dismiss stage, the Court must assume the truth of Plaintiffs' allegation that Lee was "not a threat" when Ferguson shot him.  Assuming Lee was not a threat, the Court cannot find that no reasonable jury might find the shooting violated Lee's Fourth Amendment right to be free from excessive force.  Count I thus plausibly alleges a violation of Lee's constitutional rights.  The Court therefore will not dismiss Plaintiffs' Monell claims, Counts VI and VII, for failure to satisfy

---

[15]  The Court makes no definitive ruling on whether Lee posed an immediate threat or how the body camera footage should be interpreted.  The Court merely finds that at this early stage the footage is not so clear on this point that it can cancel out Plaintiffs' allegations.

the constitutional-deprivation requirement—at least to the extent those claims are based on the Fourth Amendment violation alleged in Count I.

## CONCLUSION

For the above reasons, the Court **GRANTS in part** and **DENIES in part** the City's Motion to Dismiss. (Doc. 86.)  To the extent that Counts VI and VII against the City arise from Plaintiffs' allegation that Ferguson violated Lee's Fourth Amendment right to be free from excessive force by shooting him, the City's Motion to Dismiss Counts VI and VII is **DENIED**.  (Id.)  However, the Motion to Dismiss Counts VI and VII is **GRANTED** to the extent that those counts arise from any other alleged violation of Lee's constitutional rights.  (Id.)  The Motion is also **GRANTED** to the extent that it seeks dismissal of Count V and Count X, insofar as those counts are against the City.

The Court **LIFTS** the discovery stay, (see doc. 84), and **DIRECTS** the parties to confer and submit an updated Rule 26(f) Report within **FOURTEEN (14) DAYS** of the entry of this Order.

**SO ORDERED**, this 27th day of March, 2026.

_____

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA